# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Abel C.*, 2013 IL App (2d) 130263

---

| | |
|---|---|
| Appellate Court Caption | *In re* ABEL C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Shana C., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-13-0263 |
| Opinion filed | August 20, 2013 |
| Opinion withdrawn | October 3, 2013 |
| Modified opinion filed | October 3, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the trial court's orders finding respondent's child a neglected minor, adjudicating the child a ward of the court, and granting custody to the Department of Children and Family Services, the cause was remanded for the limited purpose of allowing the trial court to enter the express factual basis for the finding of neglect, since no factual basis was provided in the court's written order of adjudication or its oral pronouncement of the decision. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 12-JA-60; the Hon. Mary Linn Green, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Nicholas O. Meyer, of Meyer & Horning, P.C., of Rockford, for appellant. |
|---|---|
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Sally A. Swiss, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion. Justices Jorgensen and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent, Shana C., the mother of Abel C., appeals from the trial court's orders: (1) finding Abel to be a neglected minor; and (2) adjudicating Abel a ward of the court and granting custody of Abel to the Department of Children and Family Services (DCFS). We affirm.

¶ 2                      I. BACKGROUND

¶ 3    On February 17, 2012, DCFS took seven-day-old Abel into protective custody. The State thereafter filed a petition on February 22 alleging that Abel was a neglected minor under section 2-3(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(b) (West 2010)), as his environment was injurious to his welfare, placing Abel at risk of harm, in that: (1) his siblings had been removed from Shana's care and she had failed to cure the conditions that caused their removal; (2) his siblings had been removed from the care of Javier C., their father and Abel's putative father, and he had failed to cure the conditions that caused their removal; and (3) Javier was an untreated sex offender. At the shelter care hearing held on that date, the trial court, Judge Patrick Heaslip presiding, addressed Shana:

"You are named in a Petition alleging that the minor is a neglected minor. In relation to that you have a right to have a lawyer represent you in these proceedings. If you can't afford one I will appoint one for you."

When she was asked if she could afford to hire an attorney, Shana told the trial court that her friends were going to give her money to hire an attorney but she did not have an attorney that day. Shana then denied that Javier, who was her husband, was Abel's father, but she could not otherwise name the father; further, she did not know when Abel was conceived and could not name with whom she had had sexual relations in the past two years. The court then appointed Amanda Sloniker, the Conflicts 1 attorney from the office of the public defender, to represent Shana. After speaking with Shana, Sloniker informed the trial court that Shana

requested the appointment of private counsel or a continuance in order to obtain private counsel; she preferred "not to have an attorney from the Public Defender's office based on prior representation and how the prior cases were handled." The trial court denied the request. After another conversation with Shana, Sloniker told the trial court that Shana "would be waiving her right to shelter care, agreeing to temporary guardianship and custody to go to [DCFS]." The trial court found probable cause to believe that Abel was subject to the Act as a neglected minor and, as a matter of urgent and immediate necessity, it placed Abel in shelter care, granting DCFS temporary guardianship and custody. The hearing was continued as to Javier.[1]

¶ 4      On March 1, 2012, Shana appeared with private counsel, Chester Chostner, who filed his appearance; the trial court, Judge Mary Linn Green presiding, vacated Sloniker's appointment. Shana filed a motion to reconsider and vacate the February 22 order, arguing that she had requested a continuance, which was denied, and that she did not knowingly waive her right to a shelter care hearing. Sloniker informed the trial court that, at the February 22 hearing:

> "I discussed with Mom the shelter care proceeding and that, however, she was, for lack of a better word, frazzled about the whole thing, and so it's possible that she in a, I guess, fit of frustration or not thinking clearly did agree to just go forward, but I don't know that it was truly a hundred percent understood exactly what she was waiving at that point because there was a lot–a lot going on with the judge asking her questions and also just conversations about the case in the hall with myself."

The trial court continued the case for a hearing on the motion. In addition, the court ordered DNA testing for Abel and Javier (who had been made aware of the court date but had failed to appear) and found Javier to be in default for shelter care purposes. The trial court also ordered Shana to provide the names of any potential fathers of Abel. The trial court subsequently denied Shana's motion to reconsider.

¶ 5      After a period for discovery and several continuances, the case was scheduled for an adjudicatory hearing on October 4, 2012. On that date, Shana filed an appearance and informed the trial court, "I want to represent myself." The trial court then granted Chostner's oral motion to withdraw and ordered him to turn over his file to Shana by October 21. Over the State's objection, the court continued the case to October 26 for status regarding counsel and October 29 for a hearing. The court advised Shana that she did not have to "give us your decision on whether or not you want to retain new counsel, or not, but if you do decide to do that, I would ask that they be here that day."

¶ 6      On October 26, Shana informed the trial court that she was going to represent herself. The trial court responded, "Okay. I guess that's your decision. I would highly encourage you to retain counsel, but we are set for adjudication on Monday, starting at 3:30, Courtroom 216. We are going to hold to that." The court further advised Shana, "Be prepared to proceed with trial that day, do you understand? Any questions?" Shana replied "No" and, when asked if she had received Chostner's file, told the court that she had to pick it up that day.

---

[1]Javier was eventually served and defaulted and is not party to this appeal.

¶ 7 On October 29, the trial court recounted with Shana the history of her prior representation by Sloniker and Chostner. The following colloquy then took place:

"THE COURT: All right. Now, I think I said to you at that time, because you indicated you wished to represent yourself, that I thought you should be represented by counsel. Do you remember that, ma'am?

[SHANA]: Yes.

THE COURT: I am asking you here today, because we are here today for adjudication, don't you believe it would be a better idea if the Court reappointed Miss Sloniker to represent you before we have a trial on these issues?

[SHANA]: No.

THE COURT: You understand that you are not an attorney, and you are insisting on going forward, representing yourself?

[SHANA]: Yes.

THE COURT: Is that your final answer?

[SHANA]: Yes.

THE COURT: Once again I would like to remind you, the Court does not believe it is a good idea for you to do that, but you are being insistent upon that. Will you reconsider that?

[SHANA]: No.

THE COURT: You leave the court no choice; I'm going to go ahead today."

The court then proceeded to explain to Shana the State's burden of proof and the procedures to be followed during the hearing. The court also granted Shana a continuance to prepare for the hearing. The court then stated:

"Obviously, the Court takes it very seriously when people who are not lawyers decide to represent themselves in these matters; therefore, I wanted to make sure that [Shana] was given ample opportunity to prepare, but this is not an issue where we are going to keep continuing it. She has under the Court's questioning maintained that she continues to wish to represent herself. She is fairly adamant about that, and I think that the court has outlined for her what she can expect in the trial and the procedural issues."

¶ 8 Prior to the beginning of the adjudicatory hearing on November 26, the following colloquy took place:

"THE COURT: [Shana], I know that you have been represented by attorneys in the past. And the last time we were here I believe the court offered, if you could not afford it, to appoint an attorney to represent you and you refused that; is that correct?

[SHANA]: Yes.

THE COURT: You continue to refuse any offer of appointed representation?

[SHANA]: Yes, ma'am.

THE COURT: And you feel prepared to go ahead and represent yourself today?

[SHANA]: Yes, Ma'am.

THE COURT: You understand that you need to follow the rules of evidence–

[SHANA]: Yes.

THE COURT:–just as the attorneys do? All right. And you're prepared to go forward?

[SHANA]: Yes."

The case then proceeded to the hearing, after which the trial court found that the State had proved all three counts of the petition.

¶ 9    On January 30, 2013, the case proceeded to a dispositional hearing. After noting that Shana was "still not represented by an attorney," the trial court told her, "I know that I offered to appoint someone to you previously. Is that still your position?" Shana replied, "Yeah, I will be representing myself." After passing the case so that Shana and the State could confer, the court held a dispositional hearing. On February 27, 2013, the court found that Shana was willing to care for Abel but was unable and unfit to do so because she had "some unresolved mental health issues and she is hopefully engaging in now [*sic*]." The court granted continued guardianship and custody to DCFS with discretion to place Abel with a relative or in traditional foster care. The court then found that Shana qualified for appointed appellate counsel and, with Shana's agreement, appointed an attorney. This appeal followed.

¶ 10                                    II. ANALYSIS

¶ 11    Shana first contends that the trial court abused its discretion by allowing her to represent herself. According to Shana, the trial court did not conduct a thorough inquiry to determine that her waiver of counsel was voluntarily, knowingly, and intelligently made and that she was competent to represent herself. She further argues that her waiver of counsel was ineffective because the trial court did not properly admonish her of her rights.

¶ 12    The Act provides the "right to be represented by counsel" to parents of minors who are the subject of proceedings under the Act. 705 ILCS 405/1-5(1) (West 2010). Further (with one exception not relevant to this case), "[a]t the request of any party financially unable to employ counsel, *** the court shall appoint the Public Defender or such other counsel as the case may require." *Id.* In addition, this court has agreed that this statutory right to counsel also involves a constitutional right to effective counsel in abuse and neglect cases. See *In re Kr. K.*, 258 Ill. App. 3d 270, 280 (1994).

¶ 13    Shana argues that "it is axiomatic" that there must be some level of procedural safeguards to ensure that a waiver of this statutory right to counsel is made voluntarily, knowingly, and intelligently. She asserts that certain procedural safeguards, analogous to those afforded to a criminal defendant pursuant to Illinois Supreme Court Rule 401 (eff. July 1, 1984), are necessary to ensure that parents involved in proceedings under the Act are properly admonished of the right to counsel under the Act and that any waiver of that right is voluntarily, knowingly, and intelligently made. Rule 401 provides that, before a trial court may permit a person accused of an offense punishable by imprisonment to waive counsel, it must inform the person of, and determine that he understands: (1) the nature of the charge;

(2) the minimum and maximum sentences prescribed by law; and (3) his right to counsel and, if he is indigent, to have counsel appointed for him by the court.

¶ 14 Shana has not cited and, to our knowledge, cannot cite to any authority that requires any specific admonishments regarding a parent's right to counsel in a neglect proceeding, let alone any requirement that Rule 401 be used as a guideline. This court has previously declined to apply the requirements of criminal admonishments to a proceeding under the Act. In *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 34, this court refused to extend to a termination proceeding the requirements of Illinois Supreme Court Rule 402 (eff. July 1, 1997) regarding admonishments that must be given in a criminal proceeding before a guilty plea or stipulation may be accepted. Here, we similarly decline to impose the requirements of Rule 401, applicable to criminal proceedings, to a neglect proceeding under the Act. Case law suggests that no specific admonishment regarding a right to counsel is required. *In re J.R.*, 2011 IL App (3d) 100094, involved a petition of wardship alleging that the minor was delinquent under section 5-105(3) of the Act (705 ILCS 405/5-105(3) (West 2008)). On appeal, the minor's mother, Jacqualine, argued that the trial court erred when it ruled that she had made a knowing waiver of her rights to counsel and to present evidence at the dispositional hearing. The appellate court summarily dealt with this issue:

> "In this case, the record is clear that the trial court advised Jacqualine on two separate occasions that she had the right to retain counsel of her own or rely on the same counsel as the minor. On both occasions, Jacqualine indicated that she wanted to proceed with the same counsel as the minor. Under these circumstances, we find no error." *In re J.R.*, 2011 IL App (3d) 100094, ¶ 18.

¶ 15 Shana also raises the issue of competency, arguing that she possesses a "low level of intellectual functioning" and thus the trial court should have conducted a thorough inquiry to determine that her waiver of counsel was made voluntarily, knowingly, and intelligently. This argument is based on the psychological evaluation of Shana performed by Dr. Valerie Bouchard, which was received by the court on October 29, 2012. The report notes that Shana's IQ score of 79 places her in the "Borderline range of intellectual functioning." The report further notes that Shana's thought processes "were not always logical and coherent," her statements "sometimes did not make sense," and her judgment and insight were "poor." However, the report notes that Shana was "oriented to time, place, person and situation." Shana also cites to her conduct at trial as evidence that she was unable to competently represent herself at trial.

¶ 16 However, our review of even the cited portions of the record does not reveal that Shana failed to understand what was going on or acted inappropriately. To support her argument, Shana points to arguments lacking in merit, improper objections to evidence, and a lack of understanding of rules of evidence, but poor lawyering skills by a *pro se* party do not establish a lack of understanding of the proceedings.

¶ 17 The trial court is always in the best position to evaluate the temperaments, personalities, and capabilities of the parties. *In re Marriage of Petraitas*, 263 Ill. App. 3d 1022, 1031 (1993). Here, Shana was advised of her right to counsel, including appointed counsel, at the initial shelter care hearing, and she was appointed counsel at that time. At the next court date,

she appeared with counsel she had hired herself. When she advised the court that she wanted to represent herself, she was given three weeks in which to decide whether to hire a new attorney or represent herself. On subsequent court dates, the court encouraged her to hire an attorney, offered to appoint counsel to represent her, and thoroughly explained the procedures that would be followed during the adjudicatory hearing. Shana had experience with appointed counsel (in this case, as well as in prior cases) and private counsel, and she was well advised by the court of her continuing right to counsel.

¶ 18     Even in the criminal realm, we have noted that, while the right to counsel is fundamental and will not lightly be deemed to be waived, a defendant also has the correlative right to proceed without counsel, and this right is as basic and fundamental as the right to be represented by counsel. *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006). Our system of justice allows a criminal defendant to squander his right to counsel. *People v. Siler*, 85 Ill. App. 3d 304, 309 (1980) ("To each man the folly of his choice."). Although a trial court might consider a defendant's decision to proceed *pro se* to be unwise, it should honor such an election out of " 'that respect for the individual which is the lifeblood of the law.' " *People v. Silagy*, 101 Ill. 2d 147, 180 (1984) (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)). Here, Shana was well aware of her right to counsel, as well as her right to proceed *pro se*. After electing to proceed *pro se*, she turned down multiple opportunities to again be appointed counsel or to obtain private counsel. Whether wisdom or folly, we cannot say that this decision was made without knowledge and experience. The trial court's decision to allow Shana to proceed *pro se* was not error.

¶ 19     Shana next contends that the trial court's finding that Abel was a neglected minor is against the manifest weight of the evidence. The State must prove allegations of neglect by a preponderance of the evidence or, in other words, prove that the allegations of neglect are more probably true than not. *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). On review, a trial court's determination of neglect will not be reversed unless it is against the manifest weight of the evidence. *Id.* at 464. In determining whether a judgment is against the manifest weight of the evidence, this court will view the evidence in the light most favorable to the appellee; where evidence permits multiple reasonable inferences, we will accept those inferences that support the trial court's judgment. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). A trier of fact, by virtue of its ability to actually observe the demeanor and conduct of witnesses, is in the best position to assess their credibility; thus, we defer to the trial court's findings regarding credibility. *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 56. This court will not reweigh evidence or make an independent determination of credibility. *UDI No. 2, LLC v. Department of Public Health*, 2012 IL App (4th) 110691, ¶ 43. A judgment is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Arthur H.*, 212 Ill. 2d at 464.

¶ 20     In order for this court to determine whether a trial court's findings of fact are against the manifest weight of the evidence, we must be able to review both the evidence presented and the trial court's findings of fact. *In re G.W.*, 357 Ill. App. 3d 1058, 1060 (2005). Findings of fact are necessary to enable appellate review. *Id.*; *In re Madison H.*, 215 Ill. 2d 364, 379-80

(2005) (Kilbride, J., specially concurring).[2] Section 2-21(1) of the Act requires written findings of fact in neglect proceedings:

> "After hearing the evidence the court shall determine whether or not the minor is abused, neglected, or dependent. *** The court's determination of whether the minor is abused, neglected, or dependent shall be stated in writing with the factual basis supporting that determination.
>
> If the court finds that the minor is abused, neglected, or dependent, the court shall then determine and put in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings. That finding shall appear in the order of the court." 705 ILCS 405/2-21(1) (West 2010).

¶ 21    The trial court initially provided no findings of fact in its written order of adjudication. The preprinted order of adjudication was marked to indicate that Abel was: "NEGLECTED/ABUSED MINOR under section 405/2 of the Juvenile Court Act as to"; handwritten next to this was "counts 1, 2, 3, per factual finding of the court." The trial court's oral pronouncement on that day provided as follows:

> "All right. The Court has reviewed the evidence as presented, the testimony of the witnesses, the documentary evidence, uh, and finds that, uh, the State has met its burden and has proven by a preponderance of the evidence Count I, II, and III of the Neglect Petition. The Court adjudicates the minor neglected pursuant to those findings."

¶ 22    Neither the written order of adjudication nor the trial court's oral pronouncement provided any factual basis for the trial court's decision. Accordingly, this court retained jurisdiction over the appeal and entered a limited remand for the entry of the express factual basis supporting the trial court's finding of neglect. A supplemental record containing the trial court's findings of fact was filed with this court on September 16, 2013, and we now review those findings in light of the evidence presented at trial.

¶ 23    Count I of the neglect petition alleged that Abel's environment was injurious to his welfare, placing him at risk of harm, in that his siblings had been removed from Shana's care and she had failed to cure the conditions that caused their removal. The trial court took

---

[2]Findings of fact also provide the benchmark for further proceedings under the Act. Following a finding that a child is neglected under the Act, the court holds a dispositional hearing at which the court decides what further actions are in the child's best interests, in light of the findings of neglect. *In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000). The findings of fact from the adjudicatory hearing "inform the court regarding its options when it conducts the dispositional hearing." *In re J.W.*, 386 Ill. App. 3d 847, 855 (2008). The rulings at the dispositional hearing provide the parents with fair notice of what they must do to retain their parental rights to their child in the face of any future termination proceedings. *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). In addition, only after the trial court "has clearly before it the situation which led to removal can it determine whether or not the parents have taken steps to improve that situation." *In re Enis*, 145 Ill. App. 3d 753, 763-64 (1986) (where different judges presided over the adjudicatory and termination hearings, and the judge who presided over the termination proceeding was not "informed about the facts behind" the abuse findings).

judicial notice of the following records from the neglect proceedings involving the siblings: the neglect petitions, the adjudication and disposition orders, the orders following a permanency hearing, the petitions for termination of parental rights, the orders terminating parental rights, and an order acknowledging this court's affirmance of the trial court's judgment terminating parental rights. The State then presented the testimony of Jane Whitaker, the DCFS child protection investigator who took Abel into protective custody. Whitaker stated that she had learned from her investigation that DCFS got involved with Shana because of domestic violence issues and because Javier had been indicated for sexual abuse. Abel's siblings were brought into DCFS care because of domestic violence between Shana and Javier. While Whitaker was not the caseworker for the siblings, through her investigation regarding Abel she was aware that, as of April 17, 2012, neither Shana nor Javier had cured the conditions that brought the siblings into DCFS care.

¶ 24    Leslie Montoya testified that she was a foster care caseworker for the Youth Service Bureau, where she provided case management to families involved with DCFS. She had been the caseworker for Abel's siblings since July 2010 and also for Abel for two months, February through April 2012. As a result of the siblings' neglect proceedings, Shana had been ordered to complete domestic violence counseling and individual therapy (which led to a request for a psychological evaluation). While Shana made progress in the domestic violence counseling, she was unsuccessfully discharged from individual therapy in 2011 because of attendance issues and her failure to obtain a psychological evaluation. Shana did not cure the conditions that brought the siblings into DCFS care. Shana's parental rights to the siblings were terminated in February 2012.

¶ 25    On cross-examination, Montoya stated that, while Shana had not obtained a psychological evaluation at her agency, Shana told her that she had obtained an evaluation at another agency, the Glenwood Testing Center. However, Montoya could not obtain any paperwork from Glenwood, as Shana had an outstanding balance.

¶ 26    Shana testified that she engaged in services on her own "with no referrals from caseworkers." She engaged in services "with no one to appropriately file my paperwork." She had been attending WAVE for some unspecified services for approximately three years. She signed releases at WAVE several times and faxed information regarding those services to caseworkers and public defenders several times but could not remember when. She stopped attending individual therapy because she felt that her religion "was being bashed." She never had a caseworker who wanted to help her or give her referrals.

¶ 27    The trial court found that, while Shana "did engage in some services, she either did not complete the service or was discharged from the service." Shana "did not successfully complete" the services ordered as a result of the siblings' cases, such that, when Abel was brought into DCFS care, she "had not cured the conditions that brought his older siblings into care." These findings are not against the manifest weight of the evidence. Montoya clearly testified to both Shana's successes and her failures in completing the required services. Shana admitted to not completing her individual therapy; further, she did not substantiate the services that she claimed to have engaged in on her own, and she blamed everyone except herself for her failures. We find no error here.

¶ 28    Because we find no error in the trial court's finding of neglect under count I, we need not address the other bases for the trial court's ruling. Only a single ground for neglect need be proven; when a trial court has found a minor neglected on more than one ground, this court may affirm the trial court's judgment if any of the bases of neglect is upheld. *In re Faith B.*, 216 Ill. 2d 1, 14 (2005).

¶ 29                                              III. CONCLUSION
¶ 30    For these reasons, the judgment of the circuit court of Winnebago County is affirmed.

¶ 31    Affirmed.