2024 IL App (1st) 240792-U

THIRD DIVISION
October 23, 2024

No. 1-24-0792

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* K.G., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minor-Appellee | ) | Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 23 JA 00667 |
| v. | ) | |
| | ) | |
| Keshonda G., | ) | |
| Mother-Respondent-Appellant). | ) | Honorable |
| | ) | Lisa M. Taylor, |
| | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Remanding for the circuit court to "put in writing the factual basis supporting" its determination that the minor was abused and neglected, as provided in section 2-21(1) of the Juvenile Court Act of 1987.

¶ 2     Respondent Keshonda G., the natural mother of minor K.G., appeals from an adjudication order entered by the circuit court of Cook County finding K.G. to be abused and neglected.  Respondent maintains that the judgment should be reversed as the State failed to prove that K.G. was an abused and neglected minor.  She alternatively contends that the circuit

court violated section 2-21(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-21 (West 2022)) by failing to state a factual basis for its findings. As discussed below, we are persuaded by this alternative contention and thus remand this matter for the entry of written findings.

¶ 3                                                    BACKGROUND

¶ 4     The State filed a petition for adjudication of wardship as to seven-year-old K.G. on September 26, 2023, alleging respondent had a prior indicated report for inadequate supervision and was uncooperative when an intact case was opened in August 2023. On September 22, 2023, she was involved in a physical altercation while K.G. was present; police officers had prior interactions with respondent and K.G. due to "disturbances in the community." Per the petition, respondent was undomiciled and had previously been psychiatrically hospitalized.

¶ 5     The circuit court appointed legal representatives for K.G. and respondent, granted temporary custody of K.G. to the Department of Children and Family Services (DCFS) Guardianship Administrator, and permitted respondent to have supervised visits with K.G. The case proceeded to an adjudicatory hearing in March 2024; K.G.'s father was not a party to the proceedings.

¶ 6                                              *Adjudicatory Hearing*

¶ 7     The testimony and other evidence at the adjudicatory hearing included the following.

¶ 8                                                Medical Records

¶ 9     The State presented medical records from respondent's one-week hospitalization in Riveredge Hospital, a mental health treatment center. When respondent was admitted to the hospital in April 2023, she was "psychotic with religious delusions." Following her inpatient treatment, the discharge documentation indicated that her paranoia had decreased and her mood had stabilized.

¶ 10                                        Alina Bonds

¶ 11    Alina Bonds (Bonds) testified she was an intact supervisor employed by a child welfare

agency which works with DCFS.  Bonds met with respondent and K.G. after she was assigned to

their intact case in August 2023.  According to Bonds, the services recommended for the family

included housing assistance, counseling for K.G., and a mental health assessment and counseling

for respondent.  Bonds testified that respondent was "[s]omewhat" agreeable, *i.e.*, she was

willing to participate in therapy but did not think she needed a mental health assessment.

¶ 12    As of August 2023, K.G. was not enrolled in school, and he and respondent resided in her

father's garage.  Bonds attempted to engage in weekly visits with respondent and K.G. but was

unable to do so; respondent did not answer when Bonds called or knocked on the garage door.

Bonds was thus unable to view the garage interior.  Although respondent was referred to a

housing shelter on September 6, 2023, she apparently decided not to stay at the shelter.

¶ 13    Bonds testified regarding an interaction with K.G. on September 11, 2023.  After

attempting to visit respondent and K.G. at the garage, Bonds noticed them at a gas station.

Respondent was conversing with police officers as K.G. paced in a circle.  Bonds exited from her

vehicle and introduced herself to one of the officers.  When Bonds explained to the officer that

she was attempting to assist respondent with services, respondent claimed to not know Bonds.

¶ 14    During cross examination, Bonds testified that respondent had been informed that her

participation in intact services was voluntary.

¶ 15                                   Officer Adrian Gonzalez

¶ 16    Officer Adrian Gonzalez (Gonzalez), a police officer employed by the Glenwood Police

Department, testified regarding three separate incidents involving respondent and K.G.

¶ 17    On September 10, 2023, at 2 p.m., Gonzalez was dispatched to a food mart, where he

conversed with an employee. Gonzalez then approached a woman in the parking lot, who refused to provide her name; he identified her in court as respondent. K.G. was with respondent in the parking lot. Gonzalez spoke with respondent about the employee's concern that she was trespassing. Gonzalez described respondent's demeanor during the interaction as uncooperative.

¶ 18    On September 20, 2023, at 4 p.m., Gonzalez was dispatched to an intersection near a train station. He observed a train leave the station, the gates open for traffic, and an individual exit from his vehicle while yelling. The individual relayed to Gonzalez that K.G. had thrown rocks. When approached by Gonzalez, K.G. swung toward Gonzalez, who then removed rocks from K.G.'s hand. According to Gonzalez, respondent was upset; she stated, "[I]t's not illegal to be swinging arms." As respondent and K.G. left, K.G. called Gonzalez a "b***" and "flipped [him] off." Gonzalez testified respondent did not discourage K.G. from engaging in "bad behavior."

¶ 19    Gonzalez then testified that he was dispatched to a local food mart on September 22, 2023, at 3 p.m. Upon arrival, he observed respondent adjusting her wig and bra as two other females stood at a distance; K.G. was also present. Both women sustained bruised eyes and were evaluated by emergency personnel. Respondent told Gonzalez that she had "kicked their asses." Gonzalez placed respondent under arrest and took protective custody of K.G.

¶ 20                              Reginald White

¶ 21    Reginald White (White), a DCFS child protection investigator, explained that when a new incident of abuse or neglect is reported involving the same family unit, a new letter sequence is used, commencing with "A," then "B," etc. White testified he was assigned to investigate a "D sequence" report and an "E sequence" report involving respondent. Although not entirely clear, White's testimony suggested that the D sequence report related to the rock-throwing incident and the E sequence report related to the physical altercation at the food mart.

¶ 22    White spoke with respondent at the police station on September 22, 2023. She informed White that she had a place to live, but she declined to share the location. When White inquired regarding the rock-throwing incident, respondent asked him whether it was against the law to throw rocks at a train. As to the altercation near the food mart, respondent stated that she was threatened, and she defended herself. Respondent denied threatening "to shoot the store up."

¶ 23    White also conversed with K.G. at the police station when he was in protective custody. K.G. refused to state where he lived, calling it a "secret." K.G. told White that respondent allowed him to curse; White testified K.G. referred to other individuals as the "b word." K.G. informed White that he wants to be a police officer when he is older "so that he can have a gun."

¶ 24                                    Respondent

¶ 25    When questioned regarding intact services, respondent testified that Bonds explained that her participation in services was voluntary. Respondent also testified regarding the altercation with the two women near the food mart. Respondent claimed that one of the women initiated the dispute; she denied that the incident occurred after K.G. stole the woman's bicycle.

¶ 26                                Adjudication Ruling

¶ 27    After closing arguments, the circuit court entered a written order finding that K.G. was abused and neglected as defined in section 2-3 of the Act based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2022)) and a substantial risk of physical injury (*id.* § 405/2-3(2)(ii)). A box checked on the preprinted order indicated that the abuse and neglect was inflicted by respondent. The matter continued to a dispositional hearing on the same date.

¶ 28                             *Dispositional Hearing*

¶ 29    During the dispositional hearing, Christopher Burton (Burton), a DCFS child welfare specialist, testified that K.G. was placed in a foster home in September 2023. Burton testified

that K.G. was attending school; he had an individual education plan to address his "social emotional disability" and special education needs. K.G.'s foster parents expressed concern regarding certain conduct by K.G., such as stealing items and acting in a defiant manner.

¶ 30    Burton then testified that respondent was assessed to need a psychiatric evaluation, individual therapy, and parenting classes. His testimony suggested that she was in the early stages of participation in such services, *e.g.*, she was in the intake process for parenting classes. Although Burton described respondent's interactions with K.G. during weekly supervised visits as safe and appropriate, Burton noted her reluctance to relocate the visits closer to K.G.

¶ 31    The circuit court entered a written disposition order on March 14, 2024, which adjudged K.G. to be a ward of the court and found respondent unable for some reason other than financial circumstances alone to care for, protect, train, or discipline K.G. The prior temporary custody order was terminated, and K.G. was placed in the custody of the DCFS Guardianship Administrator. A separate permanency order entered on the same date set the permanency goal as "return home within 12 months." Respondent filed this timely appeal.

¶ 32                                    ANALYSIS

¶ 33    Respondent advances two primary arguments on appeal. Characterizing the evidence as "a series of disjointed vignettes," she initially contends that the State failed to prove that K.G. was an abused or neglected minor. She alternatively maintains that the circuit court violated section 2-21(1) of the Act by failing to state any factual basis for its findings. Both K.G.—who is represented by the Office of the Cook County Public Guardian (Public Guardian)—and the State challenge these contentions.[1] As discussed below, we agree with respondent's alternative argument regarding the court's noncompliance with the writing requirement of the Act, and we

_____

[1] The State filed a separate brief wherein it largely adopted the arguments of the Public Guardian.

thus remand this matter to the circuit court for the limited purpose of entering written findings.

¶ 34                    *General Procedure and Standard of Review*

¶ 35    The Act sets forth the two-step process which the circuit court must follow in determining whether a minor should be removed from parental custody and made a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 58. The first step is the adjudicatory hearing, wherein the circuit court considers only the question of whether the minor is abused, neglected, or dependent. *Id.* ¶ 59; 705 ILCS 405/2-18(1) (West 2022). If it determines that the minor is abused, neglected, or dependent, the circuit court then moves to the second step, which is the dispositional hearing. *Z.L.*, 2021 IL 126931, ¶ 60. "At the dispositional hearing, the trial court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *Id.*; 705 ILCS 405/2-21(2) (West 2022). In this case, respondent solely challenges the adjudication order, not the disposition order.

¶ 36    As repeatedly observed by our supreme court, a proceeding for adjudication of wardship " 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). Accord *Z.L.*, 2021 IL 126931, ¶ 58. The State bears the burden of proving allegations of abuse or neglect by a preponderance of the evidence. *In re S.G.*, 2022 IL App (1st) 210899, ¶ 21. In other words, the State must establish that the allegations are more probably true than not. See *Arthur H.*, 212 Ill. 2d at 464. We will not disturb the circuit court's findings that a minor has been abused or neglected unless those findings are against the manifest weight of the evidence, *i.e.,* the opposite conclusion is clearly evident. *Z.L.*, 2021 IL 126931, ¶ 61. As the circuit court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the circuit court's findings merely

because it may have reached a different conclusion. *S.G.*, 2022 IL App (1st) 210899, ¶ 22.

¶ 37                                   *Writing Requirement*

¶ 38     Section 2-21 of the Act addresses "[f]indings and adjudication." Section 2-21(1) provides, in pertinent part:

> "The court's determination of whether the minor is abused, neglected, or dependent shall be stated in writing with the factual basis supporting that determination.
>
> If the court finds that the minor is abused, neglected, or dependent, the court shall then determine and put in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings. That finding shall appear in the order of the court." 705 ILCS 405/2-21(1) (West 2022).

Although the plain language of the Act requires the circuit court to "put in writing the factual basis" supporting a determination of abuse or neglect, the circuit court in this case did not include any such writing in the adjudication order. The circuit court checked boxes on the preprinted adjudication order to indicate that K.G. was found to be neglected based on an injurious environment (*id.* § 2-3(1)(b)) and abused based on a substantial risk of physical injury (*id.* § 2-3(2)(ii)). The sole language typed on the form order as the basis for the findings was "due to the conduct of the mother."

¶ 39     The Public Guardian observes that respondent did not object or request a clarification from the circuit court during the adjudicatory ruling. According to the Public Guardian, any error could have been remedied if a challenge was raised during the circuit court proceedings. While we recognize that respondent raised the issue of the circuit court's failure to make written findings for the first time on appeal, the rule of forfeiture is a limitation on the parties and not the

court. See *In re Madison H.*, 215 Ill. 2d 364, 371 (2005) (addressing the failure to make written findings at the dispositional hearing). Moreover, our concern for reaching a just result— particularly where parental rights and the well-being of a child are at issue—may override considerations of forfeiture. See *id.* We thus elect to consider this matter on the merits.

¶ 40 Respondent directs us to *Madison H.*, wherein the Illinois Supreme Court considered the writing requirement for disposition orders set forth in section 2-27(1) of the Act (705 ILCS 405/2-27(1) (West 2002)). *Id.* at 366. Based on the failure of the circuit court to articulate the factual basis for its findings, our supreme court affirmed the appellate court decision which reversed and remanded for a new dispositional hearing and written order. *Id.* at 378. Our supreme court concluded that "the writing requirement contained in section 2-27(1) exists to give the parties notice of the reasons forming the basis for the removal of the child and to preserve this reasoning for appellate review." *Id.* at 374. Respondent in the instant case contends that the *Madison H.* reasoning "applies just as strongly to the adjudicatory hearing (section 2-21)."

¶ 41 According to the Public Guardian, a subsequent Illinois Supreme Court decision, *In re Rita P.*, 2014 IL 115798, should guide our analysis. The circuit court in *Rita P.* entered an order authorizing the involuntary treatment of the respondent with psychotropic medication. *Id.* ¶ 1. On appeal, the respondent argued that the order should be reversed, as the circuit court failed to comply with section 3-816(a) of the Mental Health and Developmental Disabilities Code (405 ILCS 5/3-816(a) (West 2010)), which provided that the order "shall be accompanied by a statement on the record of the court's findings of fact and conclusions of law." *Id.* The appellate court agreed and reversed the order. *Id.* The Illinois Supreme Court then reversed the appellate court, finding that the respondent's appeal rights or liberty interests would not be injured through a directory reading, *i.e.*, the observance of the writing requirement of section 3-816(a) was not

necessary to the validity of the proceedings. *Id.* ¶ 68. Citing *Rita P.*, the Public Guardian argues that the writing requirement of section 2-21(1) of the Act is also directory, not mandatory, and thus the lack of factual references in the ruling does not necessitate remand.

¶ 42 We observe, however, that the Illinois Supreme Court in *Rita P.* expressly distinguished its prior decision in *Madison H.*, noting that *Rita P.* "does not involve a provision of the Juvenile Court Act, nor does it involve an ongoing proceeding in which the trial court's findings are intended to provide benchmarks for the respondent's conduct." *Id.* ¶ 65. While the Public Guardian maintains that adjudication rulings (as opposed to disposition rulings) "are not designed to apprise parents of benchmarks for making progress in services," we note that this court has rejected a similar argument. The appellate court in *In re Z.Z.*, 312 Ill. App. 3d 800 (2000), found that the circuit court's adjudicatory findings on the record were sufficient but admonished that "there is a definite purpose for the statutory requirement" of section 2-21(1) of the Act, *i.e.*, the written order would set forth grounds for a termination of parental rights if there were no reasonable efforts to correct the ground that resulted in the original adjudication of the minor. *Id.* at 804 (citing 750 ILCS 50/1(D)(m) (West 1998)).

¶ 43 The State maintains that the "written and oral findings" of the court were sufficient to support the adjudication order. We recognize that a circuit court's oral ruling, when memorialized in a hearing transcript, may satisfy the writing requirements imposed by section 2-21(1) and other provisions of the Act. As the Illinois Supreme Court observed in *Madison H.*, 215 Ill. 2d at 377, "an oral finding on the record may satisfy section 2-27(1), provided that it is explicit and advises the parties of the basis for the court's decision." See also *In re Leona W.*, 228 Ill. 2d 439, 458-59 (2009) (finding the lack of detail in the written order to be a "purely technical defect" under section 2-21 where the circuit court's reasoning was "spelled out" in the

oral ruling); *In re Abel C.*, 2013 IL App (2d) 130263, ¶ 22 (reviewing the written adjudication order and the circuit court's oral pronouncement as to findings of neglect under section 2-21); *Z.Z.*, 312 Ill. App. 3d at 803-04 (noting that the circuit court made express oral findings on the record for purposes of section 2-21). In this case, however, the transcript of the oral ruling at the adjudicatory hearing reveals that the circuit court failed to articulate any factual basis for its findings of abuse and neglect. While the circuit court referenced legal principles and other matters, it did not mention any specific acts or omissions which supported its findings.

¶ 44     As neither the written adjudication order nor the oral pronouncement of the circuit court provides any factual basis for its decision, we are unable to determine whether the findings of abuse and neglect were against the manifest weight of the evidence. *Abel C.*, 2013 IL App (2d) 130263, ¶ 20; *In re Interest of M.Z.*, 294 Ill. App. 3d 581, 599 (1998). Accordingly, we retain jurisdiction over this appeal and enter a limited remand, strictly for the entry of the express factual basis supporting the circuit court's findings of abuse and neglect, not for the taking of evidence or for additional argument. Consistent with the policy requiring expeditious resolution of matters involving minors, the circuit court shall transmit its factual basis to the clerk of this court within 28 days of this decision. See Ill. S. Ct. R. 311 (eff. July 1, 2018); *Abel C.*, 2013 IL App (2d) 130263, ¶ 22; *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 41. The parties are permitted to file supplemental briefs within 14 days of the date of submission of the findings of the circuit court. We express no opinion regarding the ultimate outcome of this appeal.

¶ 45                                             CONCLUSION

¶ 46     For the reasons stated above, this cause is remanded to the circuit court of Cook County for further proceedings consistent with this order.

¶ 47     Remanded.