2024 IL App (1st) 240792-UB

THIRD DIVISION
December 11, 2024

No. 1-24-0792

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* K.G., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minor-Appellee | ) | Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | No. 23 JA 00667 |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| Keshonda G., | ) | Lisa M. Taylor, |
| Mother-Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*: Affirming the judgment of the circuit court of Cook County finding a minor to be abused and neglected.

¶ 2     Respondent Keshonda G., the natural mother of minor K.G., appeals from an adjudication order entered by the circuit court of Cook County finding K.G. to be abused and neglected as defined in section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2022)).  Respondent contends that the judgment should be reversed as the State failed to prove by a preponderance of the evidence that K.G. was an abused and neglected minor.  The State and K.G.—who is represented by the Office of the Cook County Public Guardian (Public

Guardian)—challenge respondent's contentions. For the reasons discussed below, we affirm.

¶ 3                                   BACKGROUND[1]

¶ 4     The State filed a petition for adjudication of wardship as to seven-year-old K.G. on

September 26, 2023, alleging respondent had a prior indicated report[2] for inadequate supervision

and was uncooperative when an intact case was opened in August 2023. While K.G. was

present, on September 22, 2023, respondent was involved in a physical altercation. The police

had multiple prior interactions with K.G. and respondent due to "disturbances in the

community." Per the petition, respondent was undomiciled and had previously been

psychiatrically hospitalized.

¶ 5     The circuit court appointed legal representatives for K.G. and respondent, granted

temporary custody of K.G. to the Department of Children and Family Services (DCFS)

Guardianship Administrator, and permitted respondent to have supervised visits with K.G. The

case proceeded to an adjudicatory hearing in March 2024; K.G.'s father was not a party to the

proceedings.

¶ 6                             *Adjudicatory Hearing*

¶ 7     The testimony and other evidence at the adjudicatory hearing included the following.

¶ 8                               Medical Records

¶ 9     The State presented medical records from respondent's one-week hospitalization in

Riveredge Hospital, a mental health treatment center. When respondent was admitted to the

hospital in April 2023, she was "psychotic with religious delusions." Following her inpatient

---

[1] This factual recitation is largely taken from our prior decision in this appeal, discussed below. See *In re K.G.*, 2024 IL App (1st) 240792-U.

[2] An indicated report is a report of abuse or neglect supported by credible evidence following an investigation by the Department of Children and Family Services. *In re J.S.*, 2020 IL App (1st) 191119, ¶ 20 n.2; 325 ILCS 5/3 (West 2022).

treatment, the discharge documentation indicated that her paranoia had decreased and her mood had stabilized.

¶ 10                                          Alina Bonds

¶ 11    Alina Bonds (Bonds) testified she was an intact supervisor employed by a child welfare agency which provides continuing assistance and monitoring following a DCFS investigation. Respondent's participation in intact services was voluntary.  Bonds met with respondent and K.G. after she was assigned to their intact case in August 2023.  During the meeting, respondent asked K.G. whether she should sign certain consent forms; respondent declined to sign the documents after K.G. stated "no."  Bonds testified that the services recommended for the family included housing assistance, counseling for K.G., and a mental health assessment and counseling for respondent.  According to Bonds, respondent was "[s]omewhat" agreeable, *i.e.*, she was willing to participate in therapy but did not think she needed a mental health assessment.

¶ 12    As of August 2023, K.G. was not enrolled in school, and he and respondent resided in her father's garage.  Bonds attempted to engage in weekly visits with respondent and K.G. but was unable to do so; respondent did not answer when Bonds called her cell phone or knocked on the garage door.  Bonds testified she was unable to view the garage interior.  Although respondent was referred to a housing shelter on September 6, 2023, she apparently decided not to stay at the shelter.

¶ 13    Bonds testified regarding an interaction with K.G. on September 11, 2023.  After attempting to visit respondent and K.G. at the garage, Bonds noticed them at a gas station. Respondent was conversing with police officers as K.G. paced in a circle.  Bonds exited from her vehicle and introduced herself to one of the officers.  When Bonds explained to the officer that she was attempting to assist respondent with services, respondent claimed not to know Bonds.

¶ 14                              Officer Adrian Gonzalez

¶ 15    Officer Adrian Gonzalez (Gonzalez), a police officer employed by the Glenwood Police Department, testified regarding three separate incidents involving respondent and K.G.

¶ 16    On September 10, 2023, at 2 p.m., Gonzalez was dispatched to a food mart, where he conversed with an employee. Gonzalez then approached a woman in the parking lot, who refused to provide her name; he identified her in court as respondent. K.G. was with respondent. Gonzalez spoke with respondent about the employee's "concerns" regarding trespassing.[3] Gonzalez described respondent's demeanor during the interaction as uncooperative.

¶ 17    On September 20, 2023, at 4 p.m., Gonzalez was dispatched to an intersection near a train station. He observed a train leave the station, the gates open for traffic, and an individual exit from his vehicle while yelling. Following a conversation with the individual, Gonzalez approached respondent and K.G. and informed respondent that K.G. "should not be throwing rocks." K.G. swung toward Gonzalez, who then removed rocks from K.G.'s hand. According to Gonzalez, respondent was upset; she stated, "[I]t's not illegal to be swinging arms." As respondent and K.G. left, K.G. called Gonzalez a "b***" and "flipped [him] off." Gonzalez testified respondent did not discourage K.G. from engaging in "bad behavior."

¶ 18    Gonzalez then testified that two days later he was dispatched to a local food mart. Upon arrival, he observed respondent standing in the parking lot adjusting her wig and bra as two other females stood at a distance; K.G. was also present. Both women sustained bruised eyes and were evaluated by emergency personnel. Respondent informed Gonzalez that she had "kicked their asses." As Gonzalez placed respondent in handcuffs, K.G. punched and pushed Gonzalez "to let

---

[3] Officer Gonzalez testified, in part: "I told her that she would not be trespass [*sic*] and she said okay."

[respondent] go." Upon respondent's arrest, K.G. was taken into protective custody.

¶ 19                                    Reginald White

¶ 20    Reginald White (White), a DCFS child protection investigator, explained that when a new incident of abuse or neglect is reported involving the same family unit, a new letter sequence is used, commencing with "A," then "B," etc. White testified he was assigned to investigate a "D sequence" report and an "E sequence" report involving respondent. Although not entirely clear, White's testimony suggested that the D sequence report related to the rock-throwing incident and the E sequence report related to the physical altercation at the food mart.

¶ 21    White spoke with respondent at the police station on September 22, 2023. She informed White that she had a place to live, but she declined to share the location. When White inquired regarding the rock-throwing incident, respondent asked him whether it was against the law to throw rocks at a train. As to the altercation near the food mart, respondent stated that she was threatened, and she defended herself. Respondent denied threatening "to shoot the store up."

¶ 22    White also conversed with K.G. at the police station when he was in protective custody. K.G. refused to state where he lived, calling it a "secret." White testified K.G. referred to other individuals as the "b word." K.G. told White that respondent allowed him to curse; K.G. also informed White that he wants to be a police officer when he is older "so that he can have a gun."

¶ 23                                    Respondent

¶ 24    When questioned regarding intact services, respondent testified that Bonds explained that her participation in the services was voluntary. Respondent also testified regarding the altercation with the two women near the food mart. Respondent maintained that one of the women initiated the dispute; she denied that the incident occurred after K.G. stole the woman's bicycle.

¶ 25                                    Adjudication Ruling

¶ 26     After closing arguments, the circuit court entered an order finding K.G. to be neglected and abused as defined in section 2-3 of the Act based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2022)) and a substantial risk of physical injury (*id.* § 2-3(2)(ii)).  A box checked on the preprinted order indicated that the neglect and abuse was inflicted by respondent. The matter immediately continued to a dispositional hearing.

¶ 27                                    *Dispositional Hearing*

¶ 28     During the dispositional hearing, Christopher Burton (Burton), a DCFS child welfare specialist, testified that K.G. was placed in a foster home in September 2023.  Burton testified that K.G. was attending school and had an individual education plan to address his special education needs and "social emotional disability."  K.G.'s foster parents expressed concern regarding certain conduct by K.G., such as stealing items and acting in a defiant manner.

¶ 29     Burton then testified that respondent was assessed to need a psychiatric evaluation, individual therapy, and parenting classes.  His testimony suggested that she was in the early stages of participation in such services, *e.g.*, she was in the intake process for parenting classes. Although Burton described respondent's interactions with K.G. during weekly supervised visits as safe and appropriate, Burton noted her reluctance to relocate the visits closer to K.G.

¶ 30     The circuit court entered a written disposition order on March 14, 2024, which adjudicated that K.G. be a ward of the court and found respondent unable for some reason other than financial circumstances alone to care for, protect, train, or discipline K.G.  The prior temporary custody order was terminated, and K.G. was placed in the custody of the DCFS Guardianship Administrator.  A separate permanency order entered on the same date set the permanency goal as "return home within 12 months."  Respondent filed a timely appeal.

¶ 31                            *Initial Appellate Court Ruling*

¶ 32    Respondent advanced two arguments on appeal: (a) that the State failed to prove that K.G. was an abused or neglected minor by a preponderance of the evidence; and (b) alternatively, that the circuit court violated section 2-21(1) of the Act (705 ILCS 405/2-21(1) (West 2022)) by failing to state a factual basis for its findings. On October 23, 2024, this Court entered an order in accordance with Illinois Supreme Court Rule 23(b) (eff. Feb. 1, 2023), wherein we agreed with respondent's alternative contention. We thus retained jurisdiction over this appeal and ordered a limited remand, strictly for the entry of the express factual basis supporting the findings of abuse and neglect (*In re K.G.*, 2024 IL App (1st) 240792-U, ¶ 44). In compliance with our instructions, the circuit court articulated its findings (which are discussed below) during a hearing held on November 14, 2024, memorialized the findings in a transcript, and ensured that the transcript was filed as a supplemental record in this appeal.

¶ 33                               ANALYSIS

¶ 34    Characterizing the evidence as "a series of disjointed vignettes," respondent contends that the State failed to prove that K.G. was an abused or neglected minor by a preponderance of the evidence. The Public Guardian and the State maintain that the circuit court's findings of abuse and neglect were not against the manifest weight of the evidence.

¶ 35    Prior to discussing these arguments, we briefly address the timeliness of our decision. This appeal is designated as "accelerated" pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018), as it involves child custody. Rule 311(a)(5) provides that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." *Id.* The original 150-day deadline in this matter was September 9, 2024. We observe, however, that each of the parties was granted additional time to file their appellate briefs. We

subsequently ordered the circuit court to transmit the factual basis for its findings to this court

(as discussed above), and we permitted the parties to file supplemental briefs. Based on the

foregoing, we find good cause for issuing our decision after the 150-day deadline. *E.g.*, *In re*

*B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 36                          *General Procedure and Standard of Review*

¶ 37     The Act sets forth the two-step process which the circuit court must follow in

determining whether a minor should be removed from parental custody and made a ward of the

court. *In re Z.L.*, 2021 IL 126931, ¶ 58. The first step is the adjudicatory hearing, wherein the

circuit court considers only the question of whether the minor is abused, neglected, or dependent.

*Id.* ¶ 59; 705 ILCS 405/2-18(1) (West 2022). If the circuit court determines that the minor is

abused, neglected, or dependent, it then moves to the second step, which is the dispositional

hearing. *Z.L.*, 2021 IL 126931, ¶ 60. "At the dispositional hearing, the trial court determines

whether it is consistent with the health, safety, and best interests of the minor and the public that

the minor be made a ward of the court." *Id.*; 705 ILCS 405/2-21(2) (West 2022). In this appeal,

respondent solely challenges the adjudication order, not the disposition order.

¶ 38     As repeatedly observed by our supreme court, a proceeding for adjudication of wardship

" 'represents a significant intrusion into the sanctity of the family which should not be

undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134

Ill. App. 3d 393, 396-97 (1985)); *Z.L.*, 2021 IL 126931, ¶ 58. The State bears the burden of

proving allegations of abuse or neglect by a preponderance of the evidence. *In re S.G.*, 2022 IL

App (1st) 210899, ¶ 21. In other words, the State must establish that the allegations are more

probably true than not. *Arthur H.*, 212 Ill. 2d at 464. We will not disturb findings that a minor

has been abused or neglected unless those findings are against the manifest weight of the

evidence, *i.e.,* the opposite conclusion is clearly evident. *Z.L.*, 2021 IL 126931, ¶ 61.

¶ 39                              *Neglect and Abuse Findings*

¶ 40     The circuit court found K.G. to be neglected based on an injurious environment. 705 ILCS 405/2-3(1)(b) (West 2022)) (providing that a neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare). Neglect is "the failure to exercise the care that circumstances justly demand," which encompasses both willful and unintentional disregard of parental duty. *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28. An "injurious environment" as used in section 2-3(1)(b) of the Act has been described as "a broad and amorphous concept that cannot be defined specifically, but it includes the breach of a parent's duty to ensure a safe and nurturing shelter for the children." *In re A.W.*, 231 Ill. 2d 241, 254 (2008). Accord *Z.L.*, 2021 IL 126931, ¶ 89. "This is because our courts have consistently recognized that a parent has a duty to keep her children free from harm, and her refusal to do so clearly amounts to neglect under the statute." *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 28.

¶ 41     The circuit court also found K.G. to be abused based on a substantial risk of physical injury. 705 ILCS 405/2-3(2)(ii) (West 2022)). An abused minor under section 2-3(2)(ii) of the Act includes a minor whose parent or other person responsible for his welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." *Id.* "It is well established that actual physical injury is not required to sustain a finding of abuse based on substantial risk of injury." *In re J.R.*, 2022 IL App (1st) 221109, ¶ 59.

¶ 42     Our supreme court has consistently held that cases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided based on their unique facts and

circumstances. *Z.L.*, 2021 IL 126931, ¶ 58; *Arthur H.*, 212 Ill. 2d at 463. "Adjudications of abuse and neglect must be reviewed based on the totality of the evidence." *J.R.*, 2022 IL App (1st) 221109, ¶ 53. The same evidence can support both a finding of neglect due to an injurious environment and a finding of abuse due to a substantial risk of physical injury. *Id.* ¶ 36; *In re A.S.*, 2020 IL App (1st) 200560, ¶ 34.

¶ 43 Based on our review of the record in this case, the circuit court's findings of abuse and neglect as to K.G. were not against the manifest weight of the evidence. The circuit court found that three witnesses for the State testified "credibly" during the adjudicatory hearing: intact supervisor Alina Bonds, police officer Adrian Gonzalez; and DCFS investigator Reginald White. See *S.G.*, 2022 IL App (1st) 210899, ¶ 22 (noting that the circuit court is in a superior position to assess the credibility of witnesses and to weigh the evidence).

¶ 44 As to Bonds' testimony, the circuit court found it "[m]ost concerning" that respondent "looked to her seven-year-old son to inquire as to whether she should execute consents, thereby calling into question her mental state." We share the circuit court's assessment that respondent's relinquishment of her decision-making responsibility—and K.G.'s adoption of a parental role—is troubling, particularly given her earlier in-patient psychiatric treatment at Riveredge Hospital. *E.g.*, *In re D.F.*, 201 Ill. 2d 476, 485 (2002) (discussing a caseworker's testimony that the minor had become "parentified," as she would answer the door when social services personnel arrived and then lie to the workers, telling them her mother was not at home).

¶ 45 The circuit court also referenced multiple incidents within a two-week period where police intervention occurred, including the rock-throwing incident near the train station on September 20, 2023, and the physical altercation near the food mart on September 22, 2023. Respondent attempts to minimize the significance or severity of these incidents, *e.g.*, claiming

that the State's theories regarding the risks of physical injury were "speculative and bizarre." Simply put, we reject respondent's contentions.

¶ 46    As to the train station incident, Gonzalez testified that he observed a male individual exiting his truck and approaching respondent and K.G. while yelling at them. Respondent maintains that there was no admissible evidence of rock-throwing, but we note that Gonzalez testified that K.G. swung at him with three rocks in his hand, which Gonzalez removed. Furthermore, although respondent represents that K.G. was "unscathed," we observe that the lack of physical injuries to K.G. (or to anyone else) was "merely fortuitous." *A.S.*, 2020 IL App (1st) 200560, ¶ 35. In the absence of timely police intervention, the events at the train station may have escalated to the point where K.G. could have been physically injured. *E.g.*, *A.W.*, 231 Ill. 2d at 261 (noting repeated police involvement in "calming the situations").

¶ 47    When Gonzalez informed respondent that K.G. should not be throwing rocks, respondent was upset and "said that it's not illegal to be swinging arms." As respondent and K.G. then walked away, K.G. "flipped off" and cursed at Gonzalez. The overall interaction, as described by Gonzalez, suggests that K.G. engaged in conduct which was antagonistic (*e.g.*, insulting a police officer) and potentially dangerous (*e.g.*, rock-throwing by train tracks), while respondent exhibited minimal understanding or concern as to the attendant risks. See *J.R.*, 2022 IL App (1st) 221109, ¶ 59 (stating that the respondent "did not take responsibility for [her] actions, which suggests that she does not understand the potential harm, placing [the minor] at a greater risk for permanent physical or emotional harm in the future"); *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 41 (discussing the "cosmic disconnect within respondent when it comes to [the minor's] safety" which was "clearly affecting her judgment"). Only two days later, respondent was involved in a physical altercation with two women while K.G. was present, again exposing

K.G. to the risk of harm. See *In re K.F.*, 2023 IL App (1st) 220816, ¶ 50; *A.S.*, 2020 IL App (1st) 200560, ¶ 31 (citing "several instances of violence in the home in which [the minor] was living, at least one of which occurred in [the minor's] presence").

¶ 48 At the police station after the physical altercation, both respondent and K.G. refused to tell DCFS investigator White where they resided. Citing *Santosky v. Kramer*, 455 U.S. 745, 763 (1982), respondent suggests that the circuit court's "unsupported" inference that respondent and K.G. were "presumably unhoused" may be indicative of socioeconomic bias, given respondent's representation to Bonds that she and K.G. lived in her father's detached garage. We find, however, that such an inference was reasonable based on the evidence presented, particularly given that respondent never answered when Bonds repeatedly attempted to view the interior of the garage. See *In re Adam B.*, 2016 IL App (1st) 152037, ¶ 52 (affirming findings of abuse and neglect where the respondent, in part, did not comply with recommended intact services and refused to allow the intact caseworker and the DCFS investigator to assess the safety of the homes where the minors resided).

¶ 49 The circuit court also noted White's unrefuted testimony that seven-year-old K.G. was not enrolled in school. As our supreme court has long held, the purpose of compulsory education laws "is that all children shall be educated, not that they shall be educated in any particular manner or place." *People v. Levisen*, 404 Ill. 574, 577 (1950). The record suggests, however, that respondent failed to secure any education for K.G.—circumstances which appear incompatible with respondent's duty to ensure a "nurturing shelter." *A.W.*, 231 Ill. 2d at 254.

¶ 50 "[A]ll that is needed to substantiate a finding of legal neglect and abuse under statutory terms is proof by a preponderance of the evidence of an injurious *environment* or a substantial *risk* of harm." (Emphases in original.) *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 39. See

12

also *K.F.*, 2023 IL App (1st) 220816, ¶ 49 (providing that a finding of an "injurious environment" does not require a showing of actual harm); *A.S.*, 2020 IL App (1st) 200560, ¶ 35 (noting that the Act requires a "substantial risk of physical injury" to the minor, not proof of such injury having occurred). Although characterized by respondent as a "jumbled mosaic of information," the totality of the evidence in this case painted a clear picture of a mother with housing instability and potential mental health issues who appeared to lack the understanding or inclination to shield her child from potential danger, and a school-age child without formal education who was exposed to situations which jeopardized his physical and emotional health. We thus conclude that the record does not demonstrate that the circuit court should have reached the opposite result or that its decision was unreasonable or arbitrary. See *Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29 (noting the strong and compelling presumption in favor of the result determined by the circuit court in child custody cases).

¶ 51                          CONCLUSION

¶ 52     For the reasons discussed above, the findings of abuse and neglect were not against the manifest weight of the evidence. The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 53     Affirmed.