2026 IL App (1st) 251675-U

SECOND DIVISION
June 16, 2026

No. 1-25-1675

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* N.W., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | No.    25JA490 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| N.D., | ) | Honorable |
| | ) | Patrick T. Murphy, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The juvenile court's adjudication order is affirmed where its findings that the minor was physically abused, abused based on a substantial risk of physical injury, and neglected based on an injurious environment, were not against the manifest weight of the evidence. The dispositional order is remanded for the juvenile court to comply with the requirement to provide written factual findings as provided in section 2-27(1) of the Juvenile Court Act of 1987.

¶ 2    Respondent N.D. appeals the juvenile court's orders adjudicating the minor, N.W., to be abused and neglected under the Juvenile Court Act of 1987 (Act) and finding that it was in N.W.'s best interests to be adjudged a ward of the court.

¶ 3    The record shows that respondent is the natural mother of N.W., a female child who was born on February 20, 2025. N.W.'s natural father, Ni.W., is not a party to this appeal.

¶ 4    The State filed a petition for adjudication of wardship for N.W. on June 11, 2025. The petition alleged that N.W. was physically abused, abused by being placed at a substantial risk of physical injury, and neglected in that her environment was injurious to her welfare. The petition alleged the following factual basis supporting a finding that N.W. was abused and neglected:

>      "In April of 2025 this minor presented at the hospital after [respondent and Ni.W.] were involved in a domestic altercation with each other. [Ni.W.] threw this minor over a fence during this incident which resulted in minor sustaining several injuries. Per medical personnel, in April of 2025 this minor was diagnosed with bilateral skull fractures and intracranial bleeding. [Ni.W.] has been incarcerated at Cook County Jail since the April of 2025 incident. On June 8, 2025, this minor presented at the hospital and was observed with human bite marks on her chest. Per medical personnel, this minor was also diagnosed with a new acute focal intracranial hemorrhage. Medical personnel state[d] that this [wa]s concerning for recurrent trauma. Per medical personnel, [respondent] ha[d] no plausible explanation as to how this minor was injured."

¶ 5    Based on the above, the State requested that N.W. be adjudged a ward of the Court and that the Court "enter such orders as are in the best interest of the minor."

¶ 6    On June 13, 2025, the juvenile court held a temporary custody hearing where it found probable cause that N.W. had been neglected and that urgent and immediate necessity existed to remove N.W. from respondent's care. The juvenile court placed N.W. in the temporary custody of the Department of Children and Family Services (DCFS).

¶ 7    The State was granted leave to amend the petition for adjudication of wardship on July 22, 2025, adding to the allegations that there was "an ongoing issue of domestic violence between [the] parents" and that respondent had "untreated mental health issues."

¶ 8    On August 20, 2025, the court held an adjudication hearing. The State began by introducing various documentary evidence, including certified medical records from Lurie Children's Hospital, University of Chicago Hospital, and Comer's Children's Hospital, which were admitted without objection. Those medical records primarily related to two hospital visits—the first for an April 18, 2025, incident during which the then-two-month-old N.W. was thrown over a six-foot fence; and the second on June 8, 2025, when then-four-month-old N.W. received treatment for various injuries including a bite mark to her chest.

¶ 9    The medical records relating to the April 18, 2025, incident included notes from Lurie Children's Hospital social worker Jazmine Ford, who stated that respondent alleged that Ni.W. took N.W. out of her car seat and ran off with N.W. in his arms. Respondent stated that she "did not see exactly when [Ni.W.] took the baby, but someone at the train station informed her of the direction he ran." Respondent chased Ni.W. for several blocks while on the phone with CPD. When the police arrived, Ni.W. threw N.W. over a tall fence, then hopped over the fence himself before picking N.W. up off the ground and continuing to run away. Respondent reported that police officers were able to recover N.W., and Ni.W. was arrested.

¶ 10    Respondent also reported various incidents of domestic violence between her and Ni.W. to the hospital staff, and stated that there was an order of protection entered in January 2025, but respondent only "found out about the order of protection" in March 2025. Respondent stated that her *guardian ad litem* (GAL) filed for the order or protection due to "multiple police reports [respondent] filed because of domestic violence involving" Ni.W. Respondent also confirmed that Ni.W. cared for N.W two or three times per week, and that he last cared for N.W. two or three days before the April 18, 2025, incident.

¶ 11    The records also included notes from Dr. Annie Torres, N.W.'s attending physician at Lurie Children's Hospital. Dr. Torres stated that N.W.'s "medical evaluation has been significant for bilateral parietal skull fractures, focal extra-axial hemorrhage, and healing [Classic Metaphyseal Lesions] to the left distal femoral diaphysis and left proximal tibial diaphysis." N.W.'s skull fractures and focal extra-axial hemorrhage could not be "dated with specificity," although they were "reasonabl[y] attributed" to the "witnessed trauma," which was "consistent with child physical abuse." N.W. also had "healing fractures" that "would not be consistent with the trauma observed today given their stage of healing." The records stated that the "type of fractures identified, Classic Metaphyseal Lesions (CMLs), are highly specific for abusive trauma in the context of [N.W.]'s age and development. At this time, these additional findings are most concerning for prior child physical abuse."

¶ 12    Records from the June 8, 2025, visit indicate that respondent reported that she had been "out of town in Wisconsin from June 1-6 for a funeral" and that N.W. was staying with respondent's mother, C.D. When respondent returned on June 6, 2025, she was told that N.W.'s "3 [year old] cousin with autism had pushed [N.W.] off the bed earlier that day." Respondent

4

noticed bite marks and told the medical staff that N.W.'s cousin "often goes up to people and bites them."

¶ 13    Respondent reported to a different medical provider that N.W. was "allegedly pushed out of bed" and bitten by an "autistic 2 year old relative." After respondent returned, she noticed that N.W. was "not herself" and saw evidence of the bite. Respondent applied A&D ointment and "did not initially seek care, believing that the bite would heal on its own." Respondent became concerned, however, when N.W. "continued to feed poorly," and respondent brought N.W. to the emergency department.

¶ 14    Dr. Jill Glick and Dr. Burak Arikon both provided care to N.W. related to her June hospitalization.

¶ 15    Dr. Glick set out N.W.'s medical history, including that she was seen at a clinic on May 9, 2025 "with healing left 8, 9, 10 rib fractures." Dr. Glick also stated that on May 23, 2025, "Per DCFS [N.W.] was seen and [respondent] smelled of THC, [N.W.'s] pacifier smelled of THC."

¶ 16    Dr. Glick noted that the "perpetrator of the recent injuries is a major concern." Although respondent stated that they "were due to a[n] autistic child pushing the baby off the bed, and bit[ing] her," the bite injury was "generous in size," and N.W.'s "scleral hemmorhage [sic] bilateral are highly suspicious of inflicted injuries, the baby has lots of skin injuries - this baby has not been protected."

¶ 17    During a physical exam, Dr. Arikon noted a scar on N.W.'s right ear, "[s]cleral hemorrhage more prominent on the right," "Human bite marks without drainage or swelling on chest," "Ecchymoses and healing scars on left abdomen," "Bruising on right lower eyelid," and "Healed scratch marks on right cheek."  "Given [N.W.]'s significant prior history of abuse, concerning injuries, and inconsistencies in the history, [the medical] team pursued further

workup." Two CT scans were conducted. The first showed new acute focal intracranial hemorrhage, which was "concerning for recurrent trauma, as well as "Linear lucencies *** in keeping with fractures" in N.W.'s parietal bones. The second head CT included, "Stable subdural and subarachnoid blood products as compared to prior CT. No new hemorrhage" and "Stable biparietal calvarial fractures."

¶ 18    Dr. Arikon issued the following findings:

> "1. bilateral scleral hemorrhages -from blunt trauma to face
>
> 2. Left lower eyelid bruising
>
> 3. Large ovoid healing lesion concerning for a bite
>
> 4. CT positive for acute blood in the frontal area
>
> 5. Scratches to the face, chest, and abdomen
>
> 6. History of separate event of abuse, from being thrown over fence in April by [Ni.W.], resulting in bilateral cranial fractures, left sided CML to the left femur and tibia said to be healing by Lurie intracranial bleeding and healing rib fractures."

¶ 19    Dr. Arikon further noted that the timeline of N.W.'s injuries showed that she had "bilateral skull fractures" from the April 18, 2025, incident, as well as other fractures that were seen on May 9, 2025. Dr. Arikon stated that the fractures were "probably" from the April 18, 2025, incident, but the doctor could not "state with certainty" when they occurred. N.W. also had evidence of healing knee injuries when she was seen on April 18, 2025, and those injuries were "therefore older." Finally, N.W. had evidence of "facial injuries" and a "bite to [the] chest" on June 8, 2025.

¶ 20    Drs. Glick and Arikon diagnosed N.W. with "child abuse prior and current"; "bilateral scleral hemorrhages and left eye lower lid bruising from blunt trauma"; "history of prior NAT [non-accidental trauma] with bilateral calvarial fractures, intracranial bleeding, rib fractures diagnosed in April-May 2025"; "healing CML at presentation April 2025"; and "DV history known then and continues."

¶ 21    The State also introduced certain medical records of respondent, relating to incidents of domestic violence involving Ni.W. On September 25, 2024, respondent was seen at Comer Hospital, when respondent was 17 weeks pregnant with N.W. She reported that she was walking home from school when her "ex-boyfriend" attacked her. He choked her, took her to an alley, and hit her "in the face with possibly a pole." Respondent could not see out of her swollen right eye. Respondent also had abdominal pain, and pain in her facial area.

¶ 22    Thereafter, on March 28, 2025, respondent's medical records indicate she was seen at Ingalls Memorial Hospital reporting that she was "attacked by her child's father," who "punched [respondent in the] face multiple times." Respondent also reported that he "wrapped a belt around her neck and choked her for a few minutes," until she passed out.

¶ 23    After the above medical records were introduced, the State called DCFS investigator David Ruano, who testified that he was assigned to work on the investigation on April 18, 2025. On that date, Ruano spoke to respondent at Lurie Children's Hospital, where N.W. was being treated. Respondent reported that she was standing at the train station with N.W., when a man ran up, grabbed N.W. out of her car seat, ran off, and threw N.W. over a six-foot fence. Respondent stated that the man had a mask on, but she believed the man was N.W.'s father. Ruano asked respondent how the man threw N.W., and respondent used a pillow to indicate

throwing N.W. "like a baseball player might throw a ball." N.W. landed on grass on the other side of the fence.

¶ 24    Respondent indicated to Ruano that she and Ni.W. co-parented N.W., and that there was an order of protection in place. Respondent did not have a copy of the order of protection, and Ruano never saw the order of protection. Respondent explained that her godmother, Ms. W., helps to transfer N.W. from respondent's care to Ni.W.'s care and vice versa.

¶ 25    Ruano took protective custody of N.W. when he was at Lurie Children's Hospital, and he did not know why N.W. was returned to respondent. Ruano worked the "evening shift" and transferred the case to a different investigator who worked the "day shift." Ruano was not assigned to the case after that night, and he did not follow or have any other involvement with it.

¶ 26    DCFS Investigator Tenisha Cathey testified that she was first assigned to the case on March 19, 2025. Cathey made "ongoing attempts" to contact respondent at her transitional living program (TLP), but respondent "wasn't there." Cathey was finally able to speak to respondent on March 26, 2025. Cathey informed respondent that DCFS had opened an investigation due to "concerns of domestic violence" in respondent and Ni.W.'s relationship. Respondent confirmed that "domestic violence was present," and that respondent was "in process of removing herself from the situation." Respondent told Cathey that there was an "incident the week prior at [Ni.W.]'s cousin's home in Alsip, Illinois," when respondent had to call the police because she could not get N.W. back from Ni.W. Respondent further explained that respondent's GAL secured an order of protection in January 2025 due to domestic violence in respondent's relationship with Ni.W. Respondent told Cathey that the January 2025 order involved respondent and Ni.W. Cathey never was able to see an order of protection from January 2025.

¶ 27    Respondent further told Cathey she was using family members, including Ms. W. and respondent's sister, to facilitate communication and co-parenting between respondent and Ni.W., but co-parenting was still "not working out."

¶ 28    Cathey was assigned to the family for a second time on April 19, 2025, to investigate the allegation of domestic violence between respondent and Ni.W. at a train station, when Ni.W. threw N.W. over a fence, causing multiple injuries. N.W. was later discharged from Lurie Children's Hospital and returned home with respondent pursuant to a safety plan.

¶ 29    Cathey testified that an order of protection was obtained on June 3, 2025, to protect respondent and N.W. The juvenile court asked Cathey who sought that order of protection, and Cathey stated that she was not sure who had sought the order, she just "kn[e]w we were able to locate it in our system." At that point, counsel for respondent stated that it was respondent who "went and got the order of protection." Respondent also stated, "I went to go get the order of protection in June. We *** went to court."

¶ 30    Cathey then continued her testimony. Cathey stated that she spoke with respondent over the phone on June 10, 2025. Respondent told Cathey that she had been in Wisconsin for her sister's funeral and left N.W. in the care of a friend. Respondent told Cathey that when respondent returned home and picked up N.W., N.W. was not "acting normal." Respondent described that she was having trouble feeding N.W. so respondent took N.W. to the hospital. At the hospital, medical personnel discovered injuries on N.W. including a bite mark, scratches, and a new head injury.

¶ 31    Respondent told Cathey that she noticed the bite mark while respondent was changing N.W., but respondent could not give Cathey "any details in regards to" N.W.'s head injury and swollen eye.

¶ 32    Respondent told Cathey that she "need[ed] help" with N.W. and was "willing to go do a guardianship" with her godmother, Ms. W. Cathey testified that she was told that respondent "goes AWOL" and "runs" from her TLP, and when she does, she goes to Ms. W.'s home.

¶ 33    Cathey "unfounded" the initial March 2025 investigation, but "indicated" the second investigation, and took protective custody of N.W. when N.W. was ready to be discharged from the hospital in June. Cathey explained that she "indicated" the second investigation and took protective custody of N.W. based on the "amount of injuries the minor had suffered within *** four month[s] of her being alive." Cathey elaborated that this "was the second time" N.W. had a head injury, and that she had a history of "broken bones *** [and] scratches." Cathey believed that respondent was "willing but unable to protect" N.W.

¶ 34    Cathey also testified that there was a "companion case" that she also "indicated" involving respondent's adult friend, C.S., who cared for N.W. while respondent was in Wisconsin. Cathey explained that a "companion case" involved situations when there were two perpetrators, but they do not live in the same home.

¶ 35    On cross-examination, Cathey confirmed that protective custody was taken of N.W. because there were "no safety measure[s]" in place to keep N.W. safe in respondent's care, that there was an order of protection in place, and nothing else could prevent N.W. from ongoing harm. Cathey also stated that she believed respondent's "timeline was inconsistent," and that the versions of events provided by respondent and C.S. to the medical professionals were inconsistent with N.W.'s injuries.

¶ 36    Respondent told Cathey that C.S. told respondent that C.S.'s three-year-old son bit N.W. while C.S. was in the shower. Cathey noted that the doctors "were unable to provide an estimate"

of when N.W.'s injuries occurred, so Cathey could not determine whether N.W. was injured in respondent's or C.S.'s care.

¶ 37    The medical personnel confirmed to Cathey that the bite marks on N.W. were human, but they were unable to confirm whether they were from a child or adult. Although C.S. and respondent told Cathey that the bite marks were from a 3-year-old child, the doctors "said that was inconsistent" with N.W.'s injuries. Cathey noted that N.W. had additional injuries, and that the doctors could not tell when those injuries occurred.

¶ 38    Cathey also stated that she was not sure if respondent would have been required to "go to court to get an order of protection," but confirmed that respondent had custody of N.W. at the time the June 3, 2025, order of protection was entered.

¶ 39    Cathey further testified that she learned that Ms. W. provides support to respondent, and that respondent would sometimes stay with Ms. W. instead of at respondent's TLP. Ms. W. lived closer to respondent's school, and helped respondent with N.W.'s care. Respondent told Cathey that Ni.W. did not know where Ms. W. lived, so respondent felt safer there.

¶ 40    Cathey affirmed that respondent was cooperative throughout the investigation, and when Cathey initially sought to find placement for N.W., Cathey tried to place N.W. with Ms. W. However, respondent was living at Ms. W.'s home at that time, so Cathey did not feel that Ms. W.'s home was a safe placement for N.W.

¶ 41    Cathey made multiple attempts to contact Ni.W., but she was unable to do so. Cathey was aware that Ni.W. was incarcerated in relation to the second investigation. Cathey made efforts to place N.W. with paternal family members but was unsuccessful.

¶ 42    Following the above testimony, the State and the GAL rested.

¶ 43 Respondent testified that she was born and raised in Chicago. Respondent gave birth to N.W. on February 20, 2025, at Comer Children's Hospital. Respondent testified that she loves N.W. and is very attached to her.

¶ 44 Respondent testified that N.W. was hospitalized for the first time in April 2025, after respondent and Ni.W. "got into a fight," and Ni.W. took N.W. from respondent. Respondent testified that she "believe[d] [N.W.] was thrown over a fence" because a "lady had witnessed him throwing her over a fence" and told respondent. Respondent knew that the man who took N.W. was Ni.W.

¶ 45 Respondent explained that she and respondent were staying at a temporary shelter at the time, and they got into an argument because respondent did not want to stay there anymore. Respondent stated that she, Ni.W., and N.W. went to a Dunkin Donuts so respondent could charge her phone, and Ni.W. "ran off with" N.W. Respondent called the police and reported that Ni.W. took N.W. Ni.W. told respondent that he was at the Thorndale Red Line station, so respondent went there, and she and Ni.W. began fighting again. Ni.W. then "ran off" with N.W. again.

¶ 46 Respondent testified that N.W. was taken to Lurie Children's Hospital. Respondent spoke to "about 20 people" that day, and she would recognize those people if she saw them. She specifically remembered speaking to "a lady," but she denied ever seeing or speaking to Ruano at the hospital. Respondent remembered speaking to a DCFS investigator that day, but she remembered the investigator being a woman. Respondent did recall speaking to Cathey at the hospital.

¶ 47 Respondent explained that she brought N.W. to the hospital in June because N.W. seemed to be in pain and was not eating normally.

¶ 48     Before she took N.W. to the hospital, respondent was in Racine, Wisconsin, because she was attending the funeral and other services for respondent's "God sister." Respondent testified that she checked on N.W. every day while she was out of town, and was not informed of anything concerning while she was gone. Respondent also "FaceTime[d]" with N.W., and N.W. "seemed fine"—respondent did not see any physical injuries or bruises.

¶ 49     On the day respondent returned home to Chicago, she was changing N.W.'s diaper when she noticed a bite mark. Respondent took N.W. to Olympia Fields Hospital on June 8, 2025, where they did an x-ray. Respondent asked for N.W. to be seen at Comer Children's Hospital, because they were "better at equipping her and *** had her history." When respondent went to leave with N.W., a security guard told her she had to return, and respondent complied.

¶ 50     N.W. was later treated at Comer Children's Hospital. DCFS called respondent and asked respondent to have a conversation with a counselor about what happened to N.W. Respondent had a conversation with someone who asked her questions about what happened, and then respondent "had to leave the hospital."

¶ 51     On cross-examination, respondent explained that she believed Ni.W. was the masked man who took N.W. from her because respondent and Ni.W. were "still in an argument" from the night before about N.W. "falling out of the bed." Respondent thought that Ni.W. intended to "take [N.W.] to the hospital or to the doctor" because Ni.W. "had concerns about [N.W.'s] safety," but Ni.W. "never communicated that."

¶ 52     Respondent testified that she did not bring N.W. to Wisconsin with her because she was emotional and did not know if she could "hold it together."

¶ 53     Respondent then rested her case.

¶ 54    Ni.W. testified that he was 19 years old. In March 2025, Ni.W. had N.W. in his care for a few days, and he decided to go to his cousin's house with N.W. Ni.W. tried to communicate with respondent about this, but respondent later told him that her phone had been broken for two days. Once Ni.W. was able to communicate with respondent, he and N.W. were already at his cousin's house.

¶ 55    Ni.W. explained that respondent was irritated and upset by this, and that they verbally argued. Ni.W. told respondent that he did not have a car and that buses were no longer running, so respondent would have to wait until the next day for him to return N.W. to her. Respondent did not "want to do that," so she called the police. The police and respondent came to Ni.W.'s cousin's house, and the police told Ni.W. that he had to return N.W. to respondent. Ni.W. said he "had no problem doing that," and that he could not return N.W. earlier because he did not have a car. Respondent verbally argued with Ni.W. and his cousin, and respondent and Ni.W. argued over text messages, but Ni.W. testified that there were never "any physical altercations."

¶ 56    Ni.W. testified that he had concerns about N.W.'s safety while she was in respondent's care. Ni.W. had been unable to see N.W. since he became incarcerated, but Ni.W. was aware that N.W. had been "hurt and injured." Ni.W. had "no clue how [N.W.] got hurt and got all of these excessive injuries," and he was learning about even more injuries in court on that day.

¶ 57    Ni.W. testified that he was not currently in contact with respondent, and that he was abiding by the order of protection. He and respondent communicated through his mother. Ni.W. testified that he loves N.W. and would do whatever was necessary to keep N.W. safe. When asked by the juvenile court whether he threw N.W. over a fence, Ni.W. responded by saying that those were "false allegations." Ni.W. denied ever taking N.W. from the train station.

¶ 58     On cross-examination, Ni.W. explained that prior to their communication breakdown, he and respondent did not have a "structured" childcare plan. Respondent would call him to pick up N.W. whenever respondent "had something to do or wanted a break." Ni.W. watched N.W. when respondent was attending school, and he would drop N.W. back with respondent when he needed to go to work.

¶ 59     Ni.W. then rested his case.

¶ 60     Thereafter, the juvenile court entered an order finding that N.W. was physically abused, abused by being placed at a substantial risk of physical injury, and neglected because her environment was injurious to her welfare. The juvenile court stated:

> "I've heard the evidence here. What I'm shocked at is that DCFS didn't take in custody in April. You had a kid that had all these significant injuries and Ruano testified that he took custody and then someone overruled him apparently later.
>
> [Respondent] says Ruano never talked to her, and that's a matter of *** credibility. I found *** [respondent] not [to] be a credible witness in a lot of points. I found [Ni.W.] to be more credible on many points than [respondent], and, you know, a mask[ed] man takes the kid and then it's him. We don't know if anything happened. Who threw the kid over the fence. It's—and did the mother to go [*sic*] Wisconsin?
>
> She said she's getting an order of protection on June 3rd. The hospital record says she told them she was in Wisconsin from June 1 to June 6[ ] so she apparently came in and got the [order of protection] while she was [in] Wisconsin *** and then the second set of injuries she blames on [a] two or three *** year [old] kid. Come on.

You're talking about a two or three [year] old kid. *** [T]he evidence is overwhelming here that the child was neglected and physically abused and I accept the State's evidence.

It's clearly beyond a preponderance."

¶ 61    The court then proceeded to the dispositional hearing.

¶ 62    Case worker, Angela Watts, testified that she is employed by Shelter, Inc. Watts stated that N.W. is in a non-relative, Safe Families home in Volo, Illinois. Watts testified that Shelter, Inc. "consistently looked for relatives" for N.W.'s placement, but they had not been able to find one. N.W.'s paternal grandmother was unable to care for N.W. because she had not found stable housing in the Chicago area since moving from Memphis. Ni.W.'s grandmother was also explored as an option, but she said that she was unable to care for N.W. because she did not want "anything to do with" respondent, and she did not want respondent at her home. Respondent's godmother, Ms. W., was not considered for placement because when respondent "goes AWOL," she goes to Ms. W.'s home.

¶ 63    Watts believed that it was in N.W.'s best interests for her to become a ward of DCFS. Watts explained that N.W. "sustained several injuries" from April to June 2025, when protective custody was taken. After protective custody was taken, N.W. was placed with a "Safe Family home who has been taking care of her [for] approximately two months." Watts last visited N.W. on August 6, 2025, in the foster home where N.W. lives with her foster mother, foster father, and their three biological children. N.W. had been safe, healthy, and progressing well in this home, and she was "bonded with the family."

¶ 64    Ni.W. was compliant and had completed the integrated assessment, although he had "limitations being incarcerated." Respondent also completed her intake assessment, but Watts

16

had not yet received results to know what services were recommended. Respondent had indicated that she was willing to participate in services.

¶ 65    Watts explained that respondent was originally scheduled to visit with N.W. three times per week for one hour each. Respondent recently informed Watts that she got a job working with Amazon, and respondent requested that visits be changed to one day per week for three hours. Watts adjusted the visitation schedule accordingly, and respondent visited with N.W. the Monday before the dispositional hearing. That visit "went well," although respondent "ended the visit an hour early." N.W. fell asleep during the visit, and once N.W. was asleep respondent told the supervising case aide that she "could take N.W. home" even though one hour of the three-hour visit remained. The case aide told respondent that she could continue the visit, and if N.W. woke up before the visit ended, respondent could care for N.W., or respondent could just sit and bond with N.W. while she slept. Respondent declined the offer and reiterated that the case aide "could just take [N.W.] home."

¶ 66    Prior to the most recent visit, respondent was scheduled to visit N.W. on more than eight occasions, and she had completed two visits. Respondent missed the visits because she did not confirm them pursuant to the agency's policy.

¶ 67    On cross-examination, Watts explained that when N.W. was with respondent, they lived at the transitional living center (TLC) at Thresholds Mother's Project, a mental health organization that assisted those with mental health concerns. Watts was not aware of whether respondent was prescribed or taking any mental health medications. Watts understood that respondent had refused, and would not comply with, services offered to her by Thresholds, and that she needed to complete a psychiatric evaluation to determine if she needed medicine and/or

therapeutic services. Respondent would "go on [the] run for extended periods of time" from Thresholds, and she was currently "on [the] run" at the time of the dispositional hearing.

¶ 68     After the parties rested, the juvenile court stated, "So, we're going to make the child a ward of the Court and of DCFS, and I find both parents unable at this point." Thereafter, the juvenile court entered a written form order, which checked the following boxes: (1) that N.W. "is adjudged a ward of the court, it being in the best interest and welfare of the minor"; (2) that both respondent and Ni.W. were "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor"; (3) that "[r]easonable efforts have *** been made to prevent or eliminate the need for removal of the minor from the home"; (4) that "[a]ppropriate services aimed at family preservation and family reunification have been *** unsuccessful" and (5) that it "is in the best interest of the minor to remove the minor from the custody of the parents, guardian or custodian." N.W. was placed in the guardianship of "a DCFS Guardianship Administrator with right to place the minor."

¶ 69     Respondent filed a timely notice of appeal. In this court, respondent contends that the trial court's findings that N.W. was abused and neglected, and that respondent was unable to care for N.W., were against the manifest weight of the evidence.

¶ 70     The Act provides a two-step process the juvenile court must utilize to decide whether a minor child should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing, at which the court considers only whether the minor child is abused, neglected, or dependent. *Id.*, ¶ 19; 705 ILCS 405/2-18(1) (West 2024). If the circuit court determines the minor child is abused, neglected, or dependent at that hearing, then the court holds a dispositional hearing, in which the court determines whether it is consistent with the health, safety, and best interests of the minor child and the public for the minor child to be made

a ward of the court. *Id.*, ¶ 21; See 705 ILCS 405/2-22 (West 2024). In any proceeding brought under the Act, the paramount consideration is the best interest of the child. *Id.* ¶ 18.

¶ 71    It is the State's burden to prove allegations of abuse and neglect by a preponderance of the evidence, *i.e.*, that the allegations are more probably true than not. *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). In general, the trial court has broad discretion in its findings of fact because it has the best opportunity to observe the witnesses' testimony, assess credibility, and weigh the evidence. *In re M.D.*, 2021 IL App (1st) 210595, ¶ 25; *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 47 ("The trial court has broad discretion when determining the existence of neglect or abuse as it has the best opportunity to observe the demeanor and conduct of the parties and witnesses and is therefore in the best position to determine the credibility and weight to be given to the witnesses' testimony."). We will not reverse a trial court's finding of neglect or abuse unless it is against the manifest weight of the evidence. *In re M.D.*, 2021 IL App (1st) 210595, ¶ 25. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

¶ 72    Importantly, the question to be resolved at an adjudicatory hearing is whether a child is abused or neglected, and not whether the parents are abusive or neglectful. *In re Arthur H.*, 212 Ill. 2d at 467 ("The only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful."); *In re R.G.,* 2012 IL App (1st) 120193, ¶ 35 ("[T]he focus of an adjudicatory hearing is not whether the respondent abused the minor but rather on whether the minor was abused. [Citation.] Therefore, who committed the alleged abuse * * * is of no particular consequence in an adjudicatory hearing."). A single finding of neglect, abuse, or dependency is enough to affirm the judgment of the juvenile court. *In re V.S.,* 2025 IL 129755, ¶ 58.

¶ 73    In this case, after the adjudication hearing, the trial court found that N.W. was physically abused, abused by being placed at a substantial risk of physical injury, and neglected due to exposure to an injurious environment. We will first consider the juvenile court's finding that N.W. was physically abused.

¶ 74    The Act provides that a child is physically abused when anyone "responsible for the minor's welfare *** inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(i) (West 2024). The Act further provides that "proof of injuries sustained by a minor or of the condition of a minor of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent, custodian or guardian of such minor shall be prima facie evidence of abuse or neglect, as the case may be." 705 ILCS 405/2-18(2)(e) (West 2024).

¶ 75    In this case, the record contains substantial evidence supporting the trial court's finding that N.W. was physically abused. The medical records included documentation that on April 18, 2025, N.W. suffered skull fractures and focal extra-axial hemorrhage, which were "reasonabl[y] attributed" to Ni.W. throwing N.W. over a fence, which the doctor concluded was "consistent with child physical abuse." At a later date, N.W. was also determined to have healing rib fractures, which the doctor concluded were "probably" from the April 18, 2025, incident as well, although the doctor could not "state with certainty" when those occurred.

¶ 76    Moreover, on April 18, 2025, the doctor also observed "healing fractures" in N.W.'s leg. Those fractures were "older" and therefore not explained by the April 18, 2025, incident. The doctor further explained that those fractures were "most concerning for prior child physical

abuse," because the "type of fractures identified, Classic Metaphyseal Lesions (CMLs), are highly specific for abusive trauma in the context of [N.W.]'s age and development."

¶ 77    Ther record also contains evidence regarding the June 8, 2025, hospital visit, during which N.W. was found to have

> "1. bilateral scleral hemorrhages -from blunt trauma to face
>
> 2. Left lower eyelid bruising
>
> 3. Large ovoid healing lesion concerning for a bite
>
> 4. CT positive for acute blood in the frontal area
>
> 5. Scratches to the face, chest, and abdomen
>
> 6. History of separate event of abuse, from being thrown over fence in April by [Ni.W.], resulting in bilateral cranial fractures, left sided CML to the left femur and tibia said to be healing by Lurie intracranial bleeding and healing rib fractures."

¶ 78    The doctor also expressed concern about respondent's identification of the "perpetrator of the recent injuries" as a two- or three-year-old autistic child. The doctor described the bite injury as "large" and "generous in size," and N.W.'s "scleral hemmorhage [sic] bilateral are highly suspicious of inflicted injuries, the baby has lots of skin injuries - this baby has not been protected." The doctor diagnosed N.W. with "child abuse prior and current."

¶ 79    These medical records were also corroborated at the hearing by the testimony of Ruano and Cathey, who testified regarding their investigations into respondent, Ni.W., and N.W.; and N.W.'s hospitalizations.

¶ 80    This evidence presented at the adjudication hearing clearly supports the finding that N.W. was physically abused by a preponderance of the evidence. That finding is not against the

manifest weight of the evidence, nor is the "opposite conclusion *** clearly evident." *In re M.D.*, 2021 IL App (1st) 210595, ¶ 25.

¶ 81    Respondent, however, contends that the findings are against the manifest weight of the evidence because they are "primarily based on medical records regarding two hospitalizations where no expert testified." Respondent contends that expert testimony is required because the medical records were "not conclusive about the cause or timing of any injury to N.W." We disagree.

¶ 82    Expert medical testimony is not specifically required by the language of the Act, and the Act contains a provision authorizing the admission of a minor's medical records at trial under the business records exception to the hearsay rule, permitting reliance upon them as *prima facie* proof of their contents. 705 ILCS 405/2-18(4)(a)) (West 2024). Instead, whether expert testimony is permitted or required is governed by general evidence rules, and a court should "consider the facts of each case and simply determine whether specialized knowledge is required to prove a certain proposition." *In re T.J.*, 2026 IL App (1st) 242406, ¶ 103; see also Ill. S. Ct. R. 702 (eff. Sep. 14, 2018) (expert testimony is permitted when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."); *Estate of Sewart*, 236 Ill. App. 3d 1, 15 (1991) ("Expert opinion testimony is required where more than common knowledge and experience are needed to understand the issues and to form an opinion.").

¶ 83    Based on the circumstances at issue in this case, we do not find this case to present the kind of complex medical situation for which expert testimony would be required. See *In re T.J.*, 2026 IL App (1st) 242406, ¶ 103.  An expert is not needed to assist the court in forming an opinion as to whether it is likely that a months-old infant who was observed on separate

occasions with multiple injuries including skull fractures, intracranial bleeding, leg fractures, bruising, lesions and a bite mark, has been physically abused.

¶ 84    Respondent, however, suggests that this court cannot rely on evidence showing that N.W. had healing leg fractures at the time of the April incident to conclude that physical abuse likely occurred even before April, because these are allegedly being raised "for the first time on appeal." Counsel for respondent argues that, "based on [counsel's] reading of the medical records," those fractures occurred during the April incident, and that the State and GAL are simply "searching the medical records for evidence of other abuse" which was "not raised or argued at the adjudication hearing." Respondent asserts that those medical records consist of more than 2,000 pages, and that those records were "not reviewed before the circuit court ruled at the adjudication hearing."

¶ 85    Initially, we disagree with counsel's reading of the medical records, as those records clearly established that the leg fractures observed in April were not caused by the April incident—they were in a "healing" stage at the time N.W. was seen in April, and the doctor stated that the type of injuries observed are "highly specific for abusive trauma," and are "most concerning for prior child physical abuse."

¶ 86    Moreover, we reject respondent's suggestion that the juvenile court had not reviewed the medical records which were introduced at the hearing, or that the trial court was not aware of their contents when ruling. To the contrary, in ruling, the juvenile court referenced the medical records, including that respondent had told medical staff that she was in Wisconsin from June 1 through 6, 2025—a fact that can be found in the medical records, but which was not otherwise raised at the hearing.

23

¶ 87     Finally, we also note that the juvenile court explicitly found that respondent was not "a credible witness" on "a lot of points," and such credibility assessments are entitled to "broad discretion" as the juvenile court was in the best position to "observe the demeanor and conduct of the parties and witnesses" and to "determine the credibility and weight to be given to the witnesses' testimony." *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 47.

¶ 88     The court specifically noted testimony from respondent that she sought an order of protection on June 3, 2025, when the medical records suggested that respondent had reported being in Wisconsin on that date. The record also showed that an order of protection may have been sought on respondent's behalf by her GAL in January 2025, due to "multiple police reports she filed," but respondent was not aware of that order of protection until March 2025, and neither witness was able to confirm the order's existence.

¶ 89     Although a single finding of neglect, abuse, or dependency is enough to affirm the judgment of the juvenile court (*In re V.S.,* 2025 IL 129755, ¶ 58), we would also conclude that the trial court other findings—that N.W. was abused in that she was placed at a substantial risk of physical injury, and neglected in that her environment was injurious to her welfare—were not against the manifest weight of the evidence. A minor is abused by being placed at a substantial risk of physical injury when anyone responsible for their welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2024). The term "injurious environment" under subsection (b) has been "recognized as an amorphous concept that cannot be defined with particularity," but it is "interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *In re Davon H*., 2015 IL App (1st) 150926, ¶ 51

(internal quotation marks and citations omitted).

¶ 90     The medical evidence set forth above also supports the conclusion that those responsible for N.W.'s welfare have created a substantial risk of physical injury to, and have not "ensured safe and nurturing shelter" for, N.W. In addition to the medical evidence, the record also includes substantial evidence regarding instances of domestic violence, which further supports the conclusion that N.W. was at substantial risk of physical injury and was exposed to an injurious environment. Three weeks before the April incident, respondent presented to the emergency room after allegedly being attacked by Ni.W. She reported that Ni.W. punched her in the face multiple times, wrapped a belt around her neck, and choked her, causing her to pass out. And earlier, when respondent was pregnant, she went to the hospital after Ni.W. reportedly choked her and hit her "in the face with possibly a pole." In light of this additional evidence, we certainly cannot say that the juvenile court's findings were against the manifest weight of the evidence or that the opposite conclusion is clearly evident.

¶ 91     We thus turn to the trial court's dispositional finding—that respondent is unable to care for, protect, train, or discipline N.W., and that N.W. should be made a ward of the court. Respondent contends that the trial court's finding is against the manifest weight of the evidence because she "obtained orders for protection" to protect herself and N.W.; she "took N.W. to the hospital when she needed care"; and she "completed the initial assessment" and was willing to engage in services, but she had not been offered any.

¶ 92     "If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then moves to step two, which is the dispositional hearing." *In re Z.L.*, 2021 IL 126931, ¶ 60. At the dispositional hearing, the court determines "whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the

court." *Id.* The court

> "may adjudge the minor a ward of the court and commit the minor to the custody
>
> of a third party, such as DCFS, if it finds that 'the minor's parents are unfit or
>
> unable for some reason other than financial circumstances alone, to care for,
>
> protect, train or discipline the minor or are unwilling to do so' and that 'the
>
> health, safety, and best interest of the minor will be jeopardized if the minor
>
> remains in the custody of his or her parents." *In re K.F.*, 2024 IL App (1st)
>
> 231018, ¶ 68 (quoting *In re V.S.*, 2023 IL App (1st) 220817, ¶ 63).

¶ 93    Section 2–27(1) of the Act provides that the circuit court may place a child outside the parental home "[i]f the court determines and puts in writing the factual basis supporting the determination of whether the parents * * * of a minor adjudged a ward of the court are unfit." 705 ILCS 405/2-27(1) (West 2024).

¶ 94    As an initial matter, in respondent's opening brief, she takes issue with the juvenile court's failure to make any "findings as to the reason" it found respondent unable to care for N.W.  In the GAL's response brief, the GAL acknowledges respondent's complaint, but contends that respondent did not specifically argue that the court's failure to do so requires reversal as a violation of section 2-27(1), and that she has thus forfeited that claim. In reply, respondent asserts that the issue was sufficiently raised for this court to consider it.

¶ 95    Although we agree with the GAL that respondent's initial brief did not clearly raise an issue regarding the lack of written findings in violation of section 2-27(1), we may decline to apply the rule of forfeiture in the circumstances here, when the well-being of a child and parental rights are at issue. See *In re Madison H.*, 215 Ill. 2d 364, 371 (2005) ("Under the circumstances in the present matter, where the well-being of a child and parental rights are at issue, we elect not

to apply the rule of waiver and will consider the case on the merits."); *In re S.H.*, 2018 IL App (3d) 170357, ¶ 15 ("[u]nder the circumstances in the present matter, where the well-being of a child and parental rights are at issue, we decline to apply the rule of forfeiture and will consider the merits of respondent's contention.") (internal quotation marks omitted); *In re K.G.*, 2024 IL App (1st) 240792-U, ¶ 39 ("our concern for reaching a just result—particularly where parental rights and the well-being of a child are at issue—may override considerations of forfeiture."). Accordingly, we will consider the argument on the merits.

¶ 96    As stated above, section 2–27(1) of the Act provides that the circuit court may place a child outside the parental home "[i]f the court determines and puts *in writing* the factual basis supporting the determination of whether the parents * * * of a minor adjudged a ward of the court are unfit." (Emphasis added) 705 ILCS 405/2-27(1) (West 2024). Our supreme court analyzed this section in *In re Madison H.*, 215 Ill. 2d at 371, in which the respondent mother appealed a dispositional order finding that she was unable to care for the minor and removing the minor from her care. The juvenile court had used a preprinted written form order, and checked boxes mirroring the statutory language, but had not included any factual basis for its findings. *Id.* at 370-71. Respondent mother argued, and the appellate court agreed, that the plain language of section 2–27(1) requires that the basis for the court's determination be contained in the court's written order. *Id.* at 371. The supreme court disagreed, concluding that an oral finding on the record, once transcribed, may satisfy the writing requirement of section 2–27(1) "provided that it is explicit and advises the parties of the basis for the court's decision." *Id.* at 377. The supreme court explained that the purpose of this requirement is to "give the parties notice of the reasons forming the basis for the removal of the child and to preserve this reasoning for appellate review." *Id.* at 374.

¶ 97      The supreme court thus turned to the juvenile court's oral ruling, to consider whether it was sufficient to comply with section 2-27(1). In that oral ruling, the juvenile court gave findings consistent with the statutory language, then commented:

> "[Respondent mother] and [father], as [the assistant State's Attorney] stated, and I find this as well, every indication here is that you love Madison very much and I don't doubt that at all, and I don't doubt that you are trying your hardest to be the best parents that you can to Madison. I do have concerns about your skills at his [*sic*] point, the things that you're learning in your parenting classes. I think it sounds like you're cooperating, you're doing what you need to do. I think you need to have more of that and continue to educate yourselves on being good parents. So I am going to award guardianship with the power to place and right to consent to medical and dental care to D.C.F.S. Madison will remain in foster care at this time. I'm also going to order that [father] and [respondent mother] be ordered to cooperate with the Client Service Plan and D.C.F.S." *Id.* at 370.

¶ 98      The supreme court reviewed the above comments, and found that that they were not sufficient to comply with section 2-27(1). *Id.* at 377-78. The supreme court explained:

> "Our examination reveals that the trial court's oral finding is neither explicit nor fact-specific to respondent. The testimony presented at the dispositional hearing *** and the reports considered by the court clearly indicate that respondent's developmental disability prompted the trial court's finding. However, a review of the trial court's oral statement on the record makes no mention of respondent's developmental disability and we cannot know what facts in particular the court relied upon in making its finding. The trial court's oral statement merely provides

that it is in the 'health, safety and in the interest of the minor,' that the parents are 'unable to care for, protect, train, properly discipline,' and that the 'child's health, safety and best interest would be jeopardized if the child remained in the parents' custody.' These statements mirror the statutory language—no meaningful specific factual basis is evident. The trial court only stated that it has 'concerns' about respondent's 'skills,' *** [but] the trial court did not further elaborate upon its concerns. *** Like the preprinted dispositional order described previously, the statements on the record lack the 'because' and 'facts forming the basis' for the trial court's finding. Thus, we conclude that the oral statement on the record is generic and fails to give the respondent fair notice of the reasons for its decision and, therefore, does not satisfy section 2–27(1)." *Id.*

¶ 99    Like in *Madison H.*, the juvenile court here used a preprinted written dispositional order with checked boxes that mirrored the statutory language, but the order did not contain any written factual findings. And the juvenile court's oral ruling on the record was even more generic than the one found insufficient in *Madison H.* The entirety of the juvenile's court's ruling was as follows: "So we're going to make the child a ward of the Court and of DCFS, and I find both parents unable at this point." This statement provides nothing "explicit [ ]or fact-specific to respondent" to explain the juvenile court's decision, and we likewise conclude that it "fail[ed] to give the respondent fair notice of the reasons for its decision and, therefore, does not satisfy section 2–27(1)." *Id.*

¶ 100   Accordingly, we remand to the juvenile court for the limited purpose of allowing it to enter more specific findings, consistent with the requirements of section 2–27(1). Consistent with the policy requiring expeditious resolution of matters involving minors, the circuit court shall

transmit its factual basis to the clerk of this court within 28 days of this decision. See Ill. S. Ct. R. 311 (eff. July 1, 2018); *Abel C.*, 2013 IL App (2d) 130263, ¶ 22; *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 41; *In re K.G.*, 2024 IL App (1st) 240792-U, ¶ 44. The parties are permitted to file supplemental briefs, simultaneously, within 14 days of the date of submission of the findings of the circuit court.

¶ 101   For the reasons stated above, the juvenile court's adjudication order is affirmed, and the juvenile court's dispositional order is remanded to the circuit court of Cook County for further proceedings consistent with this order.

¶ 102   Affirmed in part; remanded in part.